NOLAN v. SWIFT.

1. REAL-ESTATE AGENTS—TERMINATION OF CONTRACT.

The employment of a broker to procure a purchaser for land, which is indefinite as to time, cannot be terminated by the owner without notice to the broker.

2. SAME—RIGHT TO COMMISSION—EVIDENCE.

Evidence that defendant, knowing that plaintiff was trying to make a sale of defendant's land after the expiration of plaintiff's option thereon, wrote him that, unless he effected a sale within a certain time, all obligation on defendant's part in that regard should cease, and that plaintiff, after the expiration of the time mentioned, but before receipt of the letter, secured a purchaser, with whom defendant consummated a sale, is sufficient to establish the existence of an understanding between the parties whereby plaintiff was to find a purchaser for the land, and a consequent promise by defendant to pay plaintiff the reasonable value of his services.

Error to Wayne; Carpenter, J. Submitted October 20, 1896. Decided December 4, 1896.

*Assumpsit* by John E. Nolan against Aaron C. Fisher for commissions on the sale of real estate. Defendant died pending the trial, and the cause was revived in the names of his executors, Edward Y. Swift and Charles B. Gray. There was a judgment for plaintiff, and defendants bring error. Affirmed.

*Gray & Gray (John D. Conely,* of counsel), for appellants.

*T. E. Tarsney* and *W. W. Wicker,* for appellee.

HOOKER, J. Fisher and Seligman owned certain city lots in common, adjoining other real estate owned by Fisher in the city of Detroit; and Fisher gave to the plaintiff, Nolan, an option to purchase his interest in both

for $450,000, for the period of 30 days.   This writing is
alleged to have been made on December 8, 1891, and on
January 9, 1892, it was extended in writing until Febru-
ary 1, 1892.   There is nothing to show that it was ex-
tended longer, unless it be a letter from Gray, Fisher's
son-in-law, written by Fisher's direction and dictation on
February 5th.   It is as follows:

"FEBRUARY 5, 1892.
"JNO. E. NOLAN,
        "E. Saginaw.
"*Dear Sir:* I am requested by Mr. A. C. Fisher to
notify you that unless a sale of his entire interest or division
is made with Mr. J. Seligman or others before Saturday
night, 6th inst., all obligation on his part or extension of
option with you for sale of the property (his interest in
Fisher Block and adjoining property) will cease.
                                "CHAS. B. GRAY."

On February 5th, being the same day that this letter
was written, Nolan, who had been for several days en-
deavoring to persuade Seligman to agree on a division
and purchase of the property, succeeded in obtaining a
promise—presumably oral—from Seligman that he would
take Fisher's individual property and a portion of that
held in common, giving to Fisher the remainder of the
property held in common, and $100,000.   Nolan there-
upon went to Detroit, and on Monday following (being
the 8th of February) Seligman followed, and had an
interview with Mr. Gray, who is shown to have been the
authorized representative of Fisher, in the presence of
Nolan and others and one Doyle, who was present in the
interest of Seligman.   Mr. Gray then and there said the
price was $125,000, instead of $100,000; and Doyle testi-
fied that Seligman said he would not pay it, and the deal
ended then and there, and that the next day he (Doyle)
went to the house of Fisher, who was sick, and, after
working all·day with him, prevailed on him to accept
$100,000, and the deal was closed upon the terms talked
at Saginaw between Seligman and Nolan.   This action is
brought by Nolan to recover a commission of 2 per cent.

on the amount involved in the transaction (that being the usual commission charged on sales of real estate in Detroit), and he received a judgment for the amount claimed. The case is before us on error assigned upon the charge.

Fisher died before the case was tried, and the plaintiff gave no testimony as to what occurred between them. In addition to the testimony stated, Gray testified that he knew, at the time he wrote the letter of February 5th, that there was an arrangement between Nolan and Fisher, and that what Nolan was doing he was doing for Fisher, and that he was negotiating with Seligman.

The charge contained the following:

"Gentlemen of the jury, if the plaintiff was authorized by the defendants' testator to procure a purchaser in Mr. Seligman, by dividing this land, and if, before that authority was revoked, he brought about a division satisfactory to Mr. Fisher, then he is entitled to be compensated for what his services were reasonably worth. Now, we have no evidence of what the arrangement between Mr. Nolan and Mr. Fisher was. So far as the writings were concerned, that expired on the 1st of February. They do not control this transaction. Was there an arrangement made between them which continued after the 1st of February, and was it in existence on the 9th day of February? The only evidence that there existed any such arrangement is contained in this letter of February 5th, the terms of which are entirely familiar to you. I will read that letter to you, because it is the only evidence of the existence of any agreement between them after that date,—the 1st of February. It is dated February 5, 1892:

"'JOHN E. NOLAN, Esq.,
        "'East Saginaw.

"'*Dear Sir:* I am requested by A. C. Fisher to notify you that unless a sale of his entire interest or division is made with J. Seligman or others before Saturday night, the 6th inst., all obligation on his part or extension of option with you for sale of the property (his interest in Fisher Block and adjoining property) will cease.
                "'Very truly yours,
                        "'CHARLES B. GRAY.'

"Now, I say to you that the only evidence in this case of any arrangement between these parties exists in that letter, because Mr. Nolan cannot testify, and does not assume to testify, to any arrangement, his mouth being stopped by the statute. Mr. Fisher cannot testify, because, of course, he is not here. Now, was there such an arrangement? That is for you to say. It is for you to say what inference is to be drawn from this letter. If there was no arrangement, or if that arrangement ended on the 6th of February, 1892, there could be no recovery. So that you must find, in order to render a verdict for the plaintiff, that there was an arrangement after the 1st of February, continuing up to the time this deal was consummated, which the testimony shows was the 9th of February. If there was such an arrangement, was it revoked? The testimony is undisputed that on the 5th of February this letter was written and mailed, but I charge you that a revocation would not be conclusive unless this letter, or knowledge of this letter, or knowledge of the revocation, in some way reached Mr. Nolan before this deal was made. The testimony of Mr. Nolan is that this letter did not reach him until Thursday after the deal was consummated, on Tuesday. The important question in this case for you to determine is whether, on Saturday night, Mr. Nolan was here in Detroit, and had this interview with Mr. Gray, and Mr. Gray told him the contents of this letter, and showed him the letter in the letter-book. Mr. Gray testifies he did do that, and Mr. Nolan testified that he did not do that. Now, if, on that occasion, Mr. Nolan was notified of the revocation of his authority, he cannot recover in this case, because, in my judgment, the arrangement which existed (assuming an arrangement to exist) was one which Mr. Fisher might have terminated at any time. I do not agree with counsel that it was an arrangement which could not be terminated except by a reasonable notice. I charge you, as a matter of law, that it was an arrangement which might be terminated at will. Either party might terminate it as he chose. If, therefore, on the morning of the 6th of February, Mr. Nolan was notified of the termination of his authority, he cannot recover in this case. That, really, as counsel have argued to you on both sides, is the vital question submitted to you. If you find, however, that Mr. Nolan had an authority to procure a purchaser, and that he never had any notice of the revocation of

it until after the deal was made, on the 9th of February, then your verdict should be for him; but if, on the other hand, you find either that he had no authority, or that the authority was revoked by notice which he received on the morning of the 6th, then your verdict must be for the defendants."

The effect of this instruction was that Mr. Nolan might recover if the jury should find that an arrangement for Nolan's services existed after February 1st, and up to and including the time when the deal was consummated, and that Nolan's authority to act was not terminated by Gray's letter, unless it was brought to his notice, and that the only evidence that there was any arrangement at all was contained in the letter. Under this charge, we must conclude that the jury found that the writings did not warrant a verdict based upon the option, that plaintiff had no knowledge of the contents of the letter, and that some other arrangement than the option existed previous to and on February 5th,—presumably, an oral understanding that Nolan should continue his efforts to effectuate a trade or sale to Seligman; and, if the circumstances proved warrant the inference of such an understanding, the law will imply a promise to pay for such services their reasonable value.

In Beach on Contracts we find this subject discussed. The learned author says:

"The term 'implied contract' is generally used to denote a promise which the law, from the existence of certain facts, presumes that a party has made. An implied contract is where the intention of the parties may be gathered from their acts and from surrounding circumstances, as distinguished from an express contract, where a party stipulates in direct terms, verbally or in writing. Implied contracts, it has been said, are such as reason and justice dictate, and which the law presumes that every man has contracted to perform, and, upon this presumption, makes him answerable to such persons as suffer by his nonperformance. But all true contracts grow out of the intentions of the parties to transactions, and are dictated only by their mutual and accordant

wills. When this intention is expressed, the contract is called an 'express' one. When it is not expressed, it may be inferred, implied, or presumed from circumstances as really existing, and then the contract thus ascertained is called an 'implied' one. Both express and implied contracts are founded upon the actual agreements of the parties, the only distinction being in the character of the evidence by which the contract is proved. An express contract is proved by an actual agreement; an implied contract, by circumstances and the general course of dealing between the parties. 'A great mass of human transactions depends upon implied contracts,— upon contracts which are not written, but which grow out of the acts of the parties. In such cases the parties are supposed to have made those stipulations which, as honest, fair, and just men, they ought to have made.' Marshall, C. J., in *Ogden* v. *Saunders*, 12 Wheat. 213, 341." 1 Beach, Cont. § 639, and note 1.

Again Mr. Beach states that—

"Where one person renders services for another, which are known to and accepted by him, the law ordinarily implies a promise to pay therefor." 1 Beach, Cont. § 642.

Again, in section 650, the following language is used ·

"Where there is no relationship between the parties, and one accepts and retains the beneficial results of another's services, which he had no reason to suppose were gratuitous, and which he could or not accept at his option, the law will imply a previous request for the services, and a promise to pay what they were reasonably worth."

See authorities cited in note.

In 1 Add. Cont. 22, the author says:

"The intention of the parties to any particular transaction may be gathered from their acts and deeds, in connection with the surrounding circumstances, as well as from their words; and the law therefore implies, from the silent language of men's conduct and actions, contracts and promises as forcible and binding as those that are made by express words, or through the medium of written memorials."

While we must admit the correctness of the contention that, if the only evidence of the arrangement was to be found in the letter, the circuit judge should have construed it, this contention loses its force, because the judge was in error in so stating. The contract which the plaintiff was contending for was not one which, like the option, was to give him, or any one else, a right to purchase, and which, therefore, was void unless in writing. It was one which called for the plaintiff's services in finding a purchaser on satisfactory terms, and, if made, was performed when such purchaser was found and the premises were conveyed. The option expired, according to its terms, on February 1st. Not only does the testimony fail to show that it was extended, but Mr. Gray testified that he knew of negotiations for a division subsequent to that time, under an arrangement between Fisher and Nolan. The letter is not limited to the option, but was evidently intended to cover all arrangements. Nolan brought Seligman to Detroit to effect the deal which was finally consummated, and Gray had an interview with him and Nolan about it, at which time he refused to accept the sum of $100,000 as a basis for a trade. He says he then and there declared the deal off; but the matter was followed up with Fisher, and the trade was consummated. These facts are uncontradicted, and were sufficient to warrant an instruction that Fisher and Nolan had an understanding that Nolan should bring about a deal with Seligman, for which he should receive compensation, and therefore the instruction appears to have been harmless error. The fact that, after the termination of the written contract or option, Nolan was still trying to effect a deal with Seligman, is shown by the testimony of Gray, and by the letter dictated by Fisher, who was willing to extend the time until February 6th, or, as counsel would say, desired to place a limit upon or show that he wished to place the matter beyond controversy. Whether the contract is to be considered terminated by the letter might depend upon two things,

viz. :   (1) Whether it could be terminated without actual notice to Nolan.   (2) Whether the conduct of the parties after the letter was written did not manifest an intention to recognize and accept the benefit of the labors of Nolan under it, notwithstanding the writing of the letter.   The court instructed the jury that the contract could not be terminated without actual notice, and this is alleged to have been erroneous.   We must bear in mind that this question does not involve the validity or invalidity, or, more accurately speaking, perhaps, the binding force upon the principal, of some act or conveyance done or made, in the representative capacity of agent, by Nolan. There is nothing to indicate that any one supposed that Nolan had made a contract with Seligman which bound Fisher.   What, is claimed is that he produced a purchaser satisfactory to Fisher, under a contract which could, at the most, be terminated by notice.   We think there is a radical difference between the termination of an agency and a contract, and that a contract might be made that would not be terminated without notice, though an agency that might be involved therein might be.   Clark, Cont. § 310.   This being so, this record shows that the jury found (1) that a contract was made; (2) that it was not terminated by the letter; (3) that plaintiff produced a purchaser, which Fisher accepted.

We think these facts justify the verdict, and the judgment is therefore affirmed.

The other Justices concurred.