[Civ. No. 2015.    Third Appellate District.—July 19, 1919.]

UNITED STATES FARM LAND COMPANY (a Corporation), Respondent, v. R. L. DARTER, Appellant.

**[1]** BROKER'S COMMISSIONS — TERMINATION OF CONTRACT OF EMPLOYMENT—EVIDENCE.—In this action by a real estate broker against a land owner to recover commissions for procuring a purchaser for land under a written contract of agency, the correspondence introduced in evidence failed to show a revocation or cancellation of the contract of employment.

**[2]** ID. —EMPLOYMENT FOR INDEFINITE PERIOD — TERMINATION — NOTICE.—Where a contract of agency is for an indefinite period, the principal, in order to terminate it, must give notice of its cancellation.

**[3]** ID.—RESCISSION OF EXECUTORY CONTRACT.—While a contract of employment remains executory, the principal may rescind it, but the party claiming the right of rescission must give notice

to the other party to the contract of the fact that he does withdraw, and this before the other party has performed.

[4] ID.—CONTINUANCE OF AGENCY—PRESUMPTION.—The presumption is in favor of the continuance of the agency.

[5] ID.—EXECUTION OF CONTRACT OF PURCHASE—SUBSEQUENT MODIFICATION OF CONTRACT OF EMPLOYMENT.—A contract employing an agent to sell real property is not subject to modification by the owner after the purchaser has entered into a binding contract to purchase the property. So far as the broker is concerned, this constitutes a sale.

[6] ID.—PROCURING OF PURCHASER—PERFORMANCE OF SERVICES—SUBSEQUENT INSOLVENCY OF PURCHASER.—The services of a real estate broker are fully performed and his commission fully earned when he has procured a purchaser ready and willing to enter into a valid contract of sale upon the terms fixed by the owner. The subsequent insolvency of the purchaser so procured by the broker after the sale of the property has been completed cannot defeat the recovery of the broker's commissions.

[7] ID. — SALE AT LOWER PRICE — RIGHT TO COMMISSIONS. — When a principal makes a sale to a purchaser found by the broker, having availed himself of the broker's services, he is liable for commissions, though the sale is made at a lower price than originally proposed by him to the broker.

[8] ID.—DISSATISFACTION WITH PURCHASER—DUTY OF LAND OWNER.— If the land owner is dissatisfied with the purchasers secured by the broker, he should notify the broker to that effect or decline to enter into the contract of sale, but where he accepts them as worthy of confidence, without being misled in any respect by the broker, he is bound to pay for said services.

[9] ID.—RELATION BETWEEN PARTIES—TRIAL THEORY—APPEAL—NEW THEORY—ESTOPPEL.—Where the pleadings admit and the case is tried upon the theory that the relation between the defendant and the plaintiff was that of principal and agent, the defendant will not, on appeal, be heard to advance the theory that the relation between them was that of vendor and purchaser.

APPEAL from a judgment of the Superior Court of San Joaquin County. D. M. Young, Judge. Affirmed.

---

5. Right of broker to commission where sale is defeated by act of owner, notes, 2 Ann. Cas. 184; 20 Ann. Cas. 1024.

6. When broker's commissions are earned, notes, 139 Am. St. Rep. 225; 20 L. R. A. (N. S.) 533.

7. Right of broker to commission and amount thereof, where less than stipulated price accepted by owner, notes, Ann. Cas. 1913E, 784; Ann. Cas. 1914C, 138.

The facts are stated in the opinion of the court.

Ben Berry for Appellant.

J. W. S. Butler and B. F. Van Dyke for Respondent.

BURNETT, J.—The action was by a real estate broker against a land owner to recover five thousand dollars commissions for procuring a purchaser for land under a written contract of agency. The answer admitted the execution of said contract, but "denied that in said contract in writing defendant promised and agreed to pay to plaintiff for said services of plaintiff in the event that the plaintiff procured and introduced to defendant a purchaser of said property all money realized in excess of the sum of thirty-five thousand dollars (thirty thousand dollars?) as defendant might sell said property to a purchaser procured by plaintiff and introduced by plaintiff to defendant, but, on the contrary, defendant alleges that by the terms of said contract in writing, defendant agreed to pay plaintiff one-half of the said sum realized from such sale in excess of the sum of thirty thousand dollars that defendant might sell said property to purchaser procured by plaintiff and introduced by the plaintiff to defendant." Defendant furthermore alleged in the answer "that on the twenty-second day of June, 1915, he terminated and canceled the aforesaid agreement entered into between plaintiff and defendant on the fourth day of December, 1914," and denied that plaintiff obtained a purchaser for the premises who "was able or willing to purchase from said defendant said property or any property for the sum of thirty-five thousand dollars."

Defendant admitted that plaintiff introduced a Mr. Neergard to defendant, but denied "that said Neergard or any other person purchased said property, or any part thereof, for the sum of thirty-five thousand dollars or for any other sum of money or at all." Defendant, however, alleged that "subsequent to the termination and cancellation of the agreement, dated December 4, 1914, entered into between plaintiff and defendant, to wit, July 2, 1915, defendant entered into a contract of sale with the said Mr. Neergard and W. F. Noble, by the terms of which he agreed to sell to said Neergard and Noble the property described in plaintiff's com-

plaint for the sum of thirty-five thousand dollars, which purchase price was to be paid in installments extending over a period of years; that subsequent to the termination and cancellation of the aforesaid agreement entered into between plaintiff and defendant, defendant agreed that in the event that the said Neergard and Noble paid the installments provided in said contract of sale to be paid, he would pay plaintiff the amount agreed to be paid by the terms of the agreement dated December 4, 1914, and terminated by defendant. That the said Neergard and Noble failed to pay any of the installments provided to be paid in said contract of sale entered into between defendant and said Neergard and Noble except the sum of two thousand five hundred dollars." We may add that there is no objection to the form of the complaint and we have set out all the material parts of the answer. By the foregoing it appears that the only issues were whether the commission was to be the entire excess of the selling price over the sum of thirty thousand dollars or one-half thereof, whether said contract for the payment of a commission was terminated, and whether within the contemplation of said contract plaintiff obtained a purchaser for the premises. The court found in favor of defendant as to the amount of commission and for the plaintiff on the other issues. The discussion of the case by appellant has taken a wide range, and his counsel has displayed much learning and industry, but we think the determination of the merits is a comparatively simple matter.

The transaction between the parties is disclosed by correspondence, the managing agent of plaintiff residing in Los Angeles and defendant in Stockton. The material portions of the correspondence we shall set forth.

The first letter was written by defendant on December 4, 1914, to A. D. Kildahl, the representative of plaintiff. It opened with the statement: "Referring to our conversation when you were in Stockton with reference to the dairy ranch, will say that there is 170 acres five miles east of the Courthouse of Stockton." It proceeded with a vivid description of the land and its improvements and concluded as follows: "Make you a price of $30,000 net on this place. There is no unimproved land between this land and Stockton that can be bought below $200 per acre. I will protect you on the difference between $30,000 and what you ask for it. I

will also allow you one-half of any commission should I make a sale to any one on this property or any other property.''

To this Mr. Kildahl made answer on December 7th, stating: ''I have to-day received your favor of the 4th, with description of your dairy farm, just east of Stockton. I shall certainly bear this in mind and make every effort to dispose of it for you, probably on the basis of about $200 per acre, which would mean $4,000 commission.'' We may add that, admittedly, respondent advertised the property extensively, enlisted the services of other agents and made quite an effort to secure a purchaser for it. The result was that one Mr. Neergard became interested in the property and on May 1, 1915, plaintiff wrote to defendant: ''This will introduce to you Mr. Neergard, of Noble and Neergard, Compton, California. Mr. Neergard, who is an experienced dairyman, is looking for another location for his business, and our friend, Mr. E. L. Parke, has told them about your dairy ranch of 170 acres located close to Stockton. We would be glad if you will show Mr. Neergard the property, if not disposed of, when he reaches there. He will start North in a few days.'' Two days later plaintiff wrote another letter referring to the fact that it had written the letter of introduction of May 1st, and saying: ''Mr. Neergard will probably reach Stockton in the course of the next ten days or so and if he does, we will be very glad if you could show him your place, if not then sold. We understand that his firm is amply able to fulfill any obligation they undertake, and we hope that success will crown your efforts.''

Mr. Darter replied to the letter on May 6th, saying: ''In reply to your favor of the 3d will say that I am glad to note that Mr. Neergard is interested in the dairy. I have not sold this place yet and hope I will be able to do some business with him when he arrives.'' In answer, respondent wrote: '' We have yours of the 6th with regard to the dairy ranch, please note that the price quoted to Mr. Neergard by the broker was $35,000, including the stock and implements, We sent you a list some time ago, copies of which were sent to a number of agents and dealers here, and no doubt you have this list yet and would probably refer to it before talking price to Mr. Neergard, but I thought best to write you

and thus make sure that you understood the price that was quoted. We trust that you will be able to interest Mr. Neergard as he seems to prefer an improved place.''

On May 27th defendant wrote to Mr. Kildahl as follows: ''The parties you sent up to look at the dairy ranch came up and went out to look at the place and would be very glad to buy, but they are unable to raise more than four òr five thousand dollars. He promised me that he would bring his father-in-law and that they might get together and consider· it. Hoping you will be able to do something with it,'' etc. On June 21st, respondent wrote: ''We understand that Mr. Noble or Neergard, or both, have decided to purchase your dairy ranch of 170 acres, close to Stockton. We have not heard from you in the matter but presume you have the deal in escrow or as yet in an unfinished ·state. Please let us know how far you have progressed and how long in your opinion, it will take to close. The broker through whom we secured this prospect has today made request for his commission, and, of course, we would like to find out from you just what has been done before talking commissions to anybody. We wrote you on May 7th calling your attention to the fact that the price quoted Mr. Neergard was $35,000 and we sincerely hope that you secured this price for the ranch.''

On the day that this last letter was written Mr. Darter prepared a written contract to be executed by himself as party of the first part, and A. F. Noble and F. C. Neergard, the parties of the second part, providing ''that the said party of the first part in consideration of the covenants and agreements upon the part of the said parties of the second part herein contained, agrees to sell and convey unto the parties of the second part, and the said parties of the second part agree to purchase all that certain piece or parcel of land'' (describing the land involved herein), and, also, the improvements and personal property as described in the letter authorizing respondent to act as appellant's broker. Said contract further provided: ''It is hereby mutually agreed that the purchase price of the premises and personal property herein described shall be the sum of thirty-five thousand dollars, and the said parties of the second part in consideration of the premises, hereby agree to pay to the said party of the first part the said sum in the manner

following to wit." Then follows a statement of various installments that were to be paid extending over a period of nine years, deferred payments to bear six per cent interest, the first payment of four thousand dollars to be evidenced by a note due on or before November 15, 1915. It was further stipulated that the parties of the second part were to pay all taxes on the property after said date of November 15th and "immediate possession" of the premises was agreed to be given to said parties of the second part. This agreement of sale was forwarded on said date to Neergard and Noble, who promptly executed the same and returned it to defendant. The latter executed it on July 2d. It may be added that Neergard and Noble paid only the sum of two thousand five hundred dollars on said contract. They entered into possession of the property about the 25th of October, but afterward defaulted and surrendered it to the defendant.

On June 22d Mr. Darter replied to Mr. Kildahl as follows: "Replying to your favor of the 21st regarding to commission on sale of the dairy ranch, will say that Mr. Noble was up and looked at the ranch. Now they have not got money to buy the ranch as you stated, they want to pay a payment of four thousand dollars. That is out of the question to think of deeding a man that place on that payment, they can not pay that until Nov. 15th. I may make a deal with them, if so at the time they make their payments and get a deed to the property then I will allow you a commission on the sale. I can not do as well by you as if they paid cash or a reasonable payment besides they will not consider the place unless I paint the house outside and also clean and paint the inside floors and do this at my own expense, also hold the place without interest and I have to keep men there to cut alfalfa and tend to the cows. He also wants all the hay. I will keep account of the whole expense and will do the best I can for you but there will be no money on commissions until they pay up enough to get a deed. I hope this will be satisfactory to you; if this is not satifactory I would rather not close the deal." The reply was dated June 24th and contained this: "We quite agree with you that it would be out of the question to give him a deed on a $35,000 property, on payment of $4,000. Our purpose in writing you before

was to ask for information, the broker, Mr. Parke, having made demand on us for his share of the commission. We have written Mr. Parke today with a copy of your letter. In the latter portion of your letter, you stated that no money on commissions will be paid until the purchaser gets a deed. Please write us as to how much you would require paid for a deed. Also let us know at what price you were figuring with Mr. Noble, and what portion of this price you would require in order to pay out the commission. You understand we want to be reasonable in the matter of this commission, but having secured this prospect through another broker, we want to do the right thing by the broker, and we would like to have you secure enough down so that you can pay out our commission, or at least the major part of it.''

On June 26th Mr. Darter replied: ''Now as I explained to you in my letter of the 22d, that Mr. Noble and Neergard has only about $4,000 and they haven't that amount at the present time and that is all the money that they will be able to pay, if the deal is closed at all. They are only taking an option to buy this property, and as explained in my letter of the 22d that is if it is not satisfactory to you I would rather not close the deal. There has been no further developments in the deal up to the present time, and if I make the deal with them at all I will have to allow them ten years in which to pay for the property. While you were in Stockton, I stated to you that I wanted $10,000 to $12,000 payment. Since that time I have been losing money and the interest and entire expense of keeping the place, painting the buildings, etc., to November first will run from $1,200 to $1,500. Will say that you could not expect any commission, under about six years unless they are able to pay more than they think they will be able to, if they carry their deal through. Hoping this will be satisfactory, etc.''

On June 28th Mr. Kildahl wrote: ''We note that in case of a deal you would have to give Noble and Neergard ten years time in which to pay the deferred installments. While we would not expect you to pay out the whole commission on a down payment from the purchasers of only $4,000, yet we are quite surprised to hear that we would have to wait six years for a $5,000 commission. In

fact you estimate in your letter that we could not expect any commission at all until six years have passed by. If you sold the place at $35,000 with $4,000 down the annual payments would be $3,100 in six years $18,600, so that at the end of that period $22,600 will have been paid you. Do you not think you could reasonably be expected to pay out a $5,000 commission in less time than that? We are willing to be reasonable, but even with the larger amount of chattels included and the consequent risk we think you should pay out this commission in annual installments inside of the first three or four years. By the way, you have not as yet stated what the consideration would be in case of a deal. We are trying to get hold of the broker who was instrumental in sending us the prospect but he is out in the country and will not be back in time to find him by phone today. His attitude in the matter of commission will largely govern our action."

On the next day, June 29th, he again wrote: "Referring again to your favor of the 26th, with regard to the Noble-Neergard deal, we may say that we have today talked with Mr. Parke, the broker in the transaction, and from what he has told us we gather that these people, if properly handled, are amply able to take care of the purchase. Mr. Parke will have all his time taken tomorrow and Thursday, but promises to see Mr. Noble and Mr. Neergard on Friday without fail. On that day we shall have a report as to what can be done. It is more than likely that the $4,000 cash payment which you mentioned, can be materially increased."

On July 1st Mr. Kildahl wrote as follows: "Mr. Parke, the broker in the deal with Mr. Noble found that he was able to interview Mr. Noble sooner than anticipated, and states today that he has seen a copy of the contract between yourself and Mr. Noble. It seems to me more like an actual straight agreement for sale than an option. We are at a loss to understand why you agreed to accept $4,000 on November 15th next, as a down payment when you have been holding out for $10,000 to $12,000. If you had held out for the original down payment as outlined to the writer when in Stockton, we are quite confident that the $4,000 down payment which is now covered by note could be doubled by next fall. At least Mr. Parke, from his knowl-

edge of Mr. Noble's condition states that he is quite confident of securing $8,000 if we had been advised by you as to the conditions. With regard to commission, of course, there can be no question as to the amount, as the contract between yourself and Mr. Noble gives the consideration at $35,000 and your letter of December 4, 1914, distinctly states that you would protect us on the difference between $30,000 and what we asked for the property. As to the manner of paying this commission, we want only what is fair and reasonable, and since you have agreed to sell to Mr. Noble with such a small payment down, we, of course, will not expect the whole commission to be now paid. However, we feel that in justice to both Mr. Parke and ourselves a portion of the down payment should be used toward the payment of commission. We certainly cannot wait six years (at which time Mr. Noble will have paid $23,000) for this commission."

The next day Mr. Darter replied, saying: "I am in receipt of your favor of July 1st and note what you have to say with reference to commission on the deal and I will say that I am very much disappointed in your demand under the conditions. I certainly thought that when you sent these people here that you would allow me to use my best judgment with reference to making the sale and that you would be satisfied with whatever I did and will say further that you will have to be satisfied, as the deal has been practically consummated. . . . As I stated before I will keep account of all the extra expense that I have been, and will render you statement of the same and will allow you a commission but will say that you had just as well forget about trying to get any commission out of the first payment of $4,000. . . . I have just made arrangements this afternoon expecting to give Mr. Neergard and Mr. Noble possession at any time that they are ready." Two other letters passed between the parties, one of July 7th from Mr. Kildahl, complaining of the conduct of Mr. Darter in closing the deal without informing him, and stating that through Mr. Parke he could probably have secured eight thousand dollars in cash on the purchase. There was no modification of the demands for the commission, but the letter stated: "We shall let the present deal rest until Noble and Neergard decide on how much they want to pay in the fall."

The other was written by Mr. Kildahl on August 6, 1915, in which he stated: "We are writing you again in the matter of the $5,000 commission in the sale of the dairy farm to Messrs. Noble and Neergard as the matter is not in very satisfactory shape as it now stands. We now ask that you make an endorsement on your copy of the contract to the effect that the United States Farm Land Company has a claim of $5,000 against the contract together with interest since the date thereof, June 21, 1915. This can be made in the presence of a Notary Public or any one else who can certify to the facts. We are asking this partly because of the fact that Mr. Parke, the broker in the transaction, wants assurance that his claim will be taken care of, and partly because we want the thing fixed along business lines, in case of your death or other unforeseen circumstances."

[1] From the foregoing it is quite apparent there was no revocation or cancellation of the contract of employment. [2] The contract of agency of December 4, 1914, was for an indefinite period, and to terminate it the duty was incumbent upon appellant to give notice of its cancellation. This he did not do. [3] While a contract of employment remains executory the principal may rescind it, but the party claiming the right of rescission must give notice to the other party to the contract of the fact that he does withdraw and this before the other party has performed. (*Galty* v. *Sack*, 19 Mo. App. 470: *Nolan* v. *Swift*, 111 Mich. 56, [69 N. W. 96]; *Lloyd* v. *Matthews*, 51 N. Y. 124.)

[4] The presumption is in favor of the continuance of the agency (*Hartford* v. *McGillicuddy*, 103 Me. 224, [12 Ann. Cas. 1083, 16 L. R. A. (N. S.) 431, 68 Atl. 860]), and this is strengthened by the evidence to which we have referred. Not only did appellant fail to notify respondent of the termination of the agency, but in the correspondence which we have quoted he recognized the continued authority of respondent and only sought to secure a modification as to the time and condition of payment of the commission. The proposed modification, however, was never accepted, and it cannot be said that there was a new contract between the parties, as there was no agreement upon the terms of any modification.

[5] Indeed, we may go further and say that the proposed modification came too late to affect plaintiff's claim,

for the reason that the purchaser had already signed a contract binding him to purchase the property and this, as far as the broker is concerned, is equivalent to a sale. (*Gunn* v. *Bank of California,* 99 Cal. 349, [33 Pac. 1105]; *Pehl* v. *Fanton,* 17 Cal. App. 251, [119 Pac. 400].)

It is admitted, indeed, by appellant that he could not repudiate the agency after he had entered into a contract of sale with the purchaser.

[6] The only real question left is whether respondent performed services which entitled it to the commission. The rule is that "the services of a real estate broker are fully performed, his commission fully earned, when he has procured a purchaser ready and willing to enter into a valid contract of sale upon the terms fixed by the owner. The subsequent insolvency of the purchaser so procured by the broker after the sale of the real property has been completed can not defeat the recovery of the broker's commissions." (*Root* v. *Greadwohl,* 20 Cal. App. 139, [128 Pac. 418].)

There is no doubt herein from the foregoing correspondence that respondent procured Noble and Neergard as purchasers for the property; that appellant entered into a contract of sale with them for the consideration of thirty-five thousand dollars, and, therefore, the commission was earned, notwithstanding the purchasers afterward defaulted. [7] Indeed, the rule is that "when a principal makes a sale to a purchaser found by the broker, having availed himself of the broker's services, he is liable for commissions, though the sale was made at a lower price than originally proposed by him to the broker." (Walker on Real Estate Agency, sec. 302.)

[8] If defendant was dissatisfied with the purchasers secured by plaintiff, he should at least have notified respondent to that effect or have declined to enter into the contract of sale (*California Land Security Co.* v. *Ritchie,* 40 Cal. App. 246, [180 Pac. 625]), but having accepted them as worthy of confidence, without being misled in any respect by respondent, he is bound to pay for said service.

[9] Some contention is made in the opening brief of appellant that the relation between him and respondent was that of vendor and purchaser rather than of principal and agent. This view, however, is opposed to his admission in

the pleadings and to the theory upon which the case was tried. This theory cannot, therefore, be regarded in the appellate court. (*Blanc* v. *Connor,* 167 Cal. 719, [141 Pac. 217].)

It may be added that there is no averment or proof of fraud, there is no pretense that respondent took any advantage of appellant, and it would seem that the only debatable question is whether respondent was not entitled to a judgment for five thousand dollars instead of two thousand five hundred dollars. As to this, however, respondent has not appealed and, therefore, does not complain.

We are satisfied there is no legal ground for interfering with the conclusion of the lower court, and the judgment is affirmed.

Hart, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 15, 1919.

Angellotti, C. J., Shaw, J., Melvin, J., Lawlor, J., Lennon, J., and Olney, J., concurred.