[L. A. No. 17852. In Bank. Feb. 9, 1943.]

FRANCIS A. GUDGER, Respondent, v. MABEL MANTON
et al., Defendants; LUCILE PUGH, Appellant.

Harold A. Fendler and Bertin Weyl, Jr., for Appellant.

Eckman & Lindstrom, Ralph G. Lindstrom, Arthur W. Eckman and Robert L. Moore, for Respondent.

CARTER, J.—Plaintiff and respondent, Francis Gudger, was awarded compensatory damages in the sum of $16,000 in an action for slander of title to real property against all of the defendants, except defendant, Harry G. Sadicoff, judgment being given in favor of him. Defendant Pugh alone prosecutes this appeal therefrom.

In 1932, defendant Manton obtained a judgment for $40,166.45 in New York against plaintiff's wife arising out of a premarital tort. Appellant Pugh, a New York attorney, not admitted to practice in California, was Manton's counsel in that action. Her compensation arrangement was a 40 per cent contingent fee contract. The judgment being unpaid, appellant, without Manton's knowledge, communicated with defendants, Hamilton and Hoornaert, California attorneys, with regard to the collection of the judgment and on December 6, 1934, requested them to institute proceedings immediately for the collection of the judgment; plaintiff and his wife were then residing in Los Angeles. Appellant agreed to pay defendants Hamilton and Hoornaert 20 per cent of her 40 per cent contingent fee. Following communications between appellant and Hamilton and Hoornaert, and on January 7, 1935, the latter commenced an action in Manton's name in California on the New York judgment against plaintiff's wife. After appellant had communicated with Hamilton and Hoornaert with reference to the return

of the papers with a bill for their services, the latter obtained the entry of a default judgment against plaintiff's wife. Thereafter, in 1938, said defendants, Hamilton and Hoornaert, through defendant Sadicoff, an attorney at law, had levied and recorded a writ of execution upon all interest of plaintiff's wife in certain described real property standing of record in plaintiff's name. Plaintiff was not disturbed in his possession. Plaintiff's wife had no interest in the property, it being plaintiff's separate property. The instant action followed in January, 1938, in which plaintiff sought to quiet title to the real property and for damages for the levy and continuance of the execution on his property. He prevailed in both claims, the latter being here in dispute insofar as appellant is concerned. The execution was released by defendants in February, 1939, after the commencement of this action.

The judgment here under attack rests upon the theory of a slander by appellant of the title of plaintiff's property, or more accurately the wrongful disparagement of plaintiff's title thereto to his injury. At the outset it is helpful to have before us an accurate definition of that tort. It may be best stated as follows: ''One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused.'' (Rest. Torts, § 624.) The amplification and application of that rule to the facts in the instant case will hereafter appear.

 With that rule in mind we turn to appellant's contentions. She asserts that the levy of and recording of a writ of execution upon the real property of another, not a party to the judgment, does not constitute a lien nor cloud upon the title, and where the judgment debtor has no interest in the property, no right of the owner thereof is affected, and therefore it cannot be the basis for a disparagement of title action; that a levy of execution under such circumstances is not a cloud on the title such as is removable by an action for that purpose or grounds for injunctive relief; and that the levy was only upon the right, title and interest if any, which plaintiff's wife had in the property, and did

not purport to cloud plaintiff's title if his wife had no interest therein. The fallacy of that argument is plain. If a lien were in fact legally created by the levy then the levy would be justified; there would be no falsity and thus no disparagement of title within the definition. Of necessity, in order that the elements of that tort may exist, the lien must be false, that is without legal foundation. Under appellant's reasoning a disparagement of title action never would lie for the recording of an instrument affecting another's title. It has been held that the recording of a document making a false claim to real property may constitute the publication of the disparaging matter in the tort in question; naturally the document could not in fact or law constitute a meritorious legal claim to the property. *Coley* v. *Hecker*, 206 Cal. 22 [272 P. 1045], involved the recording of an abstract of judgment after an undertaking staying execution pending an appeal had been filed; *Fearon* v. *Fodera*, 169 Cal. 370 [148 P. 200, Ann.Cas. 1916D, 313], concerned a deed by one having no interest in the property; *Ezmirlian* v. *Otto*, 139 Cal.App. 486 [34 P.2d 774], involved the recordation of an assignment of royalties when the one causing the recording had no interest in the property. The recording of the notice of the execution necessarily embraced the imputation that plaintiff's wife had the whole or a part interest in plaintiff's property, and that such interest was subject to the execution levy. Otherwise there would have been no reason for recording the writ and notice of execution. Such instruments on record had all the appearance of an assertion by defendants of a claim to an interest in the property, and as a matter of common knowledge would have an effect upon a prospective purchaser of the property and the merchantability of the title. He would naturally assume that plaintiff's title was not merchantable, as it was encumbered by a lien to an indefinite extent. Defendants as reasonable persons should have reasonably foreseen that such would be the effect of their action. The essence of the matter is that there has been an actionable disparagement of title if the plaintiff has been proximately damaged thereby. The question of damages is hereafter discussed. Appellant refers to several cases from other jurisdictions apparently contrary to the views herein expressed, but we are not inclined to agree with the holdings therein. If the matter is reasonably understood to cast doubt upon the ex-

istence or extent of another's interest in land, it is disparaging to the latter's title where it is so understood by the recipient. (Rest. Torts, § 629.) As we have seen, the reasonable imputation of the recording was a claim of an interest adverse to plaintiff's title. Whether a cloud on the title in the technical sense existed was immaterial. While it is true the execution claimed only such interest as plaintiff's wife had in the property, the only reasonable implication is that in fact the wife did have an interest in the property and a lien thereon was claimed.

It is asserted that there was no evidence or finding of malice on the part of appellant. In discussing that issue it is necessary to clarify the meaning to be given to particular terms. There has been considerable confusion and lack of rationalization flowing from the use of the term malice. It arises chiefly from the failure to clearly distinguish between malice implied in law and actual malice. The former is a mere legal fiction, while the latter denotes ill will or the desire to do harm for the satisfaction of doing it or conduct which in effect amounts to the same thing. Actual malice becomes important on the question of punitive damages, or the availability of certain conditional privileges. In the instant action no punitive damages were awarded; therefore the issue of actual malice is not important in that respect. The discussion here is concerned with the right to recover compensatory damages. In the definition heretofore given of the tort, disparagement of title, it will be noted that the publication of the disparagement must be "without privilege." That phrase may be well amplified by adding thereto or "without justification." The burden of proof of that lack of privilege is upon the plaintiff in the tort here discussed as is actual malice, if that term be employed, and the existence of the circumstances necessary to create the privilege is one of fact. (Rest. Torts, §§ 651, 652.) Actual malice may under proper circumstances indicate a lack of privilege or justification and a cause of action exists if the other elements of the tort are present. (See in a somewhat similar situation, *Imperial Ice Co.* v. *Rossier*, 18 Cal. 2d 33, 36 [112 P.2d 631].) The rule has been concisely stated: "One who publishes matter disparaging to another's property in land, chattels or intangible things is subject to liability under the rule stated in section 624 [set forth, *supra*], although he (a) did not intend to influence a third

person's conduct as purchaser or lessee of the thing in question; neither knew nor believed the disparaging matter to be false; did not publish the matter from ill will toward the other or a desire to cause him loss.'' (Rest. Torts, § 625.)

██ True, it has been said or intimated that malice is an essential element in slander of title. (*Fearon* v. *Fodera, supra; Burkett* v. *Griffith,* 90 Cal. 532 [27 P. 527, 25 Am.St. Rep. 151, 13 L.R.A. 707] ; *McDaniel* v. *Baca,* 2 Cal. 326 [56 Am.Dec. 339] ; *Kendis* v. *Cohn,* 90 Cal.App. 41 [265 P. 844] ; *Ezmirlian* v. *Otto, supra; Coley* v. *Hecker, supra.*) That malice may, however, be express or implied. (*Fearon* v. *Fodera, supra; Kendis* v. *Cohn, supra;* see cases collected 129 A.L.R. 179.) And, if there is an absence of privilege or justification, and the other elements necessary are present, an implication of malice in law is proper, if that term is used, or actual malice may in some cases show lack of privilege. There is nothing substantially contrary to those rules on the facts presented in *Fearon* v. *Fodera, supra,* or *McDaniel* v. *Baca, supra.* In those cases the circumstances established that the publication of the disparaging matter was privileged or justified. In *Ezmirlian* v. *Otto, supra,* there was no privilege or justification. The question in the instant case becomes therefore, whether the defendants were without privilege or justification, it being undoubted that the publication was false as plaintiff's wife had no interest in his property.

██ First, however, appellant complains that there was no finding of malice, but as we have seen, such a finding, if malice in law is meant, would be merely a conclusion of law and this court may make such a finding as well as the trial court. ██ There must, of course, be found present circumstances which are deemed in law a lack of privilege, or, as will be hereafter discussed, in connection with privilege, a lack of good faith or actual malice.

██ Also in connection with the findings it is asserted that because the plaintiff's complaint alleged malice and the case was based upon the theory of malice, there must be a finding thereon. Suffice it to say a judgment may be affirmed on appeal if any theory finds support in the evidence and findings, and further, we have heretofore seen that actual malice is not necessarily essential.

██ This brings us then to a consideration of whether or not there was a privilege or justification, or whether there

was actual malice which would affect the privilege. Appellant contends that the levy of the execution was absolutely privileged as being an act in the due course of a judicial proceeding. (Civ. Code, § 47.) ▇ The levy of a writ of execution is not an act in the course of a judicial proceeding. It is merely an endeavor to collect a judgment rendered in the judicial proceeding, and the acts of the public officials involved are purely ministerial. In *Coley* v. *Hecker, supra,* this court stated that the wrongful recording of an abstract of judgment was not a malicious abuse of process, but rather was a slander of the owner's title in the same category as a forged deed.

▇ The privilege stated in section 47(3) of the Civil Code is invoked. "A privileged publication is one made—3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information." Section 48 of the Civil Code states that malice is not inferred in the cases where the privilege in question is involved. That privilege is a qualified or conditional one. (16 Cal.Jur. 67.) Here there was in reality no communication to plaintiff as a person interested. The recording of the execution was notice to all persons of a claim of interest by defendant Manton for the benefit of the latter, the same as a publication in a newspaper of a libel concerning a private person. Surely that would not be considered a communication to the victim as a person interested within the meaning of the rule of privilege here in question, although in a sense the victim would be interested in what the publication of the libel contained. Subdivisions 2 and 3 and the above quoted portion of section 47 are likewise inapplicable because they are predicated upon a communication to the person interested, the communicant being one other than the person interested.

A rival claimant of property is conditionally privileged to disparage or justified in disparaging another's property in land by an honest and good faith assertion of an inconsistent legally protected interest in himself. (See *Thompson* v. *White,* 70 Cal. 135 [11 P. 564]; Rest. Torts, § 647.) The levy of an execution is an assertion of a claim to an in-

terest in that it is a lien on the property levied upon. Therefore, if in the instant case defendants acted in good faith, that privilege defeats plaintiff's action. Actual malice has a bearing upon the question of good faith.

In the findings of the court there is no express finding of lack of good faith, or of actual malice either of which would destroy the privilege or justification here discussed. There is evidence, however, which points unerringly to a lack of good faith on defendants' part. Plaintiff is not liable for the New York judgment against plaintiff's wife or the California judgment obtained thereon; plaintiff's wife had no interest in his property upon which the execution was levied and recorded at the instance of defendants on September 16, 1938; on September 21, 1938, plaintiff demanded a release of the execution and informed defendants that plaintiff's wife had no interest therein, giving defendants every cooperation in making an investigation, but defendants refused to release it; plaintiff was examined under oath on October 9, 1938, in connection with third party claimant proceedings and it was unequivocally shown that his wife had no interest in the property; a release was refused although Sadicoff, the attorney who obtained the levy for Hamilton and Hoornaert informed the latter that the execution was not proper, advised a release of the execution and withdrew from the case; defendants made no further investigation thereafter, except to examine plaintiff's safe deposit box on November 5, 1938, but they still refused to release the levy until February 15, 1939; after the commencement of this action, deeds by which plaintiff's wife conveyed the property to him were found in the box; they were given in order that no doubt would exist that the property belonged to plaintiff as his separate estate, inasmuch as it was acquired during marriage; in appellant's letter to defendants Hamilton and Hoornaert in reference to their employment for the enforcement of the New York judgment in California, she stated: ''I also wish to pass on to you certain information which I received some time ago from my representatives in Tennessee concerning the financial condition of *Miss Rambeau's husband, Francis A. Gudger* (plaintiff therein). I am informed that he is *extremely wealthy*, having personal property in the neighborhood of $200,000 in addition to various realty holdings. He has an estate at Ashville, N. C. and a winter home at Sebring, Florida. Of course, while the property of the husband is

not subject to this judgment, nevertheless, *the husband's social and financial position is a factor to be considered.*" (Emphasis added.) And "You can see from what I told you in my letter of January 10th, about her husband's financial standing and holdings—his Florida and Ashville estates, *they* could well afford to pay this judgment." (Emphasis added.) The only reasonable conclusion is that although plaintiff was not liable on the judgment and his wife had no interest in his property, an endeavor was to be made to use an execution affecting plaintiff's property as a weapon, effective by reason of its effect on his social and financial standing, to cause him to pay his wife's obligation. That certainly established a lack of good faith. True, there is evidence that defendant Hamilton believed that plaintiff's wife had an interest in his property. In plaintiff's deposition in the third party claimant proceedings he stated that he had made investments of his wife's funds in securities which he took in his name, deeds were found in a safety deposit box conveying the property from plaintiff's wife to him and dated after the California judgment was obtained, the property was acquired after plaintiff's marriage, from which it might be believed that it was plaintiff's wife's property and he took title thereto in his name. ██ However, by reason of the foregoing persuasive evidence and the findings of the trial court in favor of plaintiff on the other issues, we are convinced that this court should make a finding, that the execution was not levied or maintained in the exercise of good faith or in the honest belief that plaintiff's wife had an interest in the property, and that defendants' acts were not justified or privileged. Pursuant to power granted under the Constitution and statutory law of this state (Cal. Const., art. 6, § 4¾; Code Civ. Proc., § 956a) a jury having been waived, such finding is hereby made in order to affirm the judgment.

██ It is contended by appellant that there is no evidentiary support for the findings connecting her with the tort; that she was merely a forwarding attorney, an agent for defendant Manton, the judgment creditor in the New York and California judgments, and thus not responsible for the acts of defendant attorneys in California, there being no showing that incompetent subagents were knowingly chosen by her. Those issues turn chiefly upon the evidence.

The findings of the trial court were that defendants (plural)

did the various things such as having the execution levied and maintained. If the conduct of the defendant California attorneys was in a capacity as her agents then the findings are sufficient, inasmuch as the act of an agent in the scope of his employment is the act of the principal.

The evidence is sufficient to establish that appellant was acting in the capacity of a principal rather than merely as the agent of defendant Manton in engaging the California attorneys Hamilton and Hoornaert to enforce Manton's New York judgment against Mrs. Gudger. She was Manton's counsel in the New York action. She stated in her letter of December 6, 1934, written to Hamilton and Hoornaert, in regard to the collection by them of the New York judgment from Mrs. Gudger that the matter was to be handled on the basis of 20 per cent of her fee in the case which she was "handling on a 60-40 basis, 40% being my contingent fee," and Hamilton and Hoornaert were to be paid from her fee; her client Manton was not to pay any part of it. This indicates that she was employing Hamilton and Hoornaert on her own behalf rather than on behalf of Manton. Although she had a contract with Manton retaining her in the action, she had not heard from her for some time and Manton had no knowledge of her negotiations with the California attorneys. But in February, 1935, she wrote of "our client" and that the client instructed her to sever the relations. In negotiations carried on with other California counsel she stated "I have an interest in the judgment." In August, 1938, she wrote to Sadicoff "In the first place I have a *substantial interest in the judgment and in any moneys collected thereon* by reason of my having taken the case on a contingent fee basis and have made many disbursements which have not been repaid." (Emphasis added.) She had or claimed to have an attorney's lien on the New York judgment for her fee. It is clear that the evidence was sufficient to support the conclusion that appellant was acting as a principal, as well as an agent for Manton, rather than as merely a forwarding attorney or agent employing a subagent in engaging Hamilton and Hoornaert to collect the judgment. There is conflicting evidence such as appellant not being a party to the action in California on Manton's New York judgment, and that defendant Hamilton contacted Manton with reference to collection of the judgment, but such conflicts have been resolved against appellant by the trier of fact.

The negotiations with Manton may fairly be said to have been for the purpose of obtaining additional authority from one who was in reality merely a coprincipal. It follows that the authorities relied upon by appellant with relation to the nonliability of an agent for the acts of a subagent or of a forwarding attorney for the acts of the attorney to whom the matter is sent are not pertinent. Appellant was more than a mere subagent or forwarding attorney.

The evidence establishes that appellant was responsible for the acts of the defendants California attorneys. It is true that she had no personal knowledge of the levy of the execution by those defendants, or the taking of plaintiff's deposition in the action in California on the New York judgment in which he denied that Mrs. Gudger had any interest in the property, or the contents of the safety deposit box used by him and his wife, and that no demand was made upon her personally for a release of the execution. However, if the California attorneys, defendants, were acting within the scope of their authority she is responsible for their acts and their knowledge is imputed to her. She employed them to collect the New York judgment which would naturally include the levy of execution. There is evidence from which it may be inferred that she authorized defendants, her agents, to use the levy of the execution to force plaintiff to pay the judgment against his wife although he was not liable thereon and his wife had no interest in his property. That was evinced by her letter to Hamilton on January 10, 1935, in which she stated she was informed that plaintiff was extremely wealthy and that "of course, while the property of the husband (plaintiff) is not subject to this judgment, nevertheless, the husband's social and financial position is a factor to be considered," and later, on January 22, 1935, she wrote: "You can see from what I told you in my letter of January 10th, about her (Mrs. Gudger's) financial standing and holdings—his Florida and Ashville estates, they could well afford to pay this judgment." Evidence to the contrary merely creates a conflict with which we are not concerned. The argument of appellant to the effect that a principal is not liable for the commission by his agent of a malicious tort or of slander of title, where it is necessary to show lack of good faith or justification, is beside the point, because the conduct of the agent in the instant case was embraced within the scope of the authority conferred by

the principal when the agency was created. If a tort is committed by an agent within the scope of his employment and with the authority of his principal, the latter is liable even though the acts are wilful or malicious. (See *Deevy* v. *Tassi*, S. F. No. 16754, decided October 30, 1942, 21 Cal.2d 109 [130 P.2d 389].)

Appellant claims that even if the California attorneys were her agents for whose acts she was responsible, they had been discharged before the execution was levied. She refers to correspondence she had with the defendants, California attorneys, after the latter had been employed and had commenced action in California on the New York judgment. In reply to a letter from Hamilton to appellant concerning the collection of the judgment, the latter wired to the former on February 2, 1935, that unless Hamilton could obtain a better offer than $20,000 in settlement of the judgment "kindly return papers with your bill." On the same date appellant wrote to Hamilton stating the telegram had been sent, but continuing also to discuss the collection of the judgment. On February 4, 1935, Hamilton wrote to appellant acknowledging the receipt of the telegram, and stating that he would endeavor to make a satisfactory settlement, but if he could not, he would commence supplementary proceedings against Mrs. Gudger, to which appellant telegraphed: "LETTER 4th RECEIVED CLIENT'S INSTRUCTIONS CONTAINED IN MY TELEGRAM SECOND PLEASE FOLLOW STOP." On the same date Hamilton's letter to appellant stated: "I do not understand from your telegram of February second that you wish the papers returned to you without permitting me to be in a legal position to try to collect this money. If you do, I will gladly return them to you together with my bill for services rendered.

"If I am permitted to secure this judgment and endeavor to collect the monies, and if I am unable to collect the same I would certainly not expect any fee whatsoever. I feel that my securing the judgment here would place me in a position to collect if Miss Rambeau is working.

"If, however, you desire to cancel your instructions in reference to the suit, please advise me and I will be more than glad to cooperate with you. I would, however, appreciate a letter from you explaining your position fully so that there may be no misunderstanding, as I am more than

anxious to comply with your requests and do just what you desire.'' He then referred to the telegram of February 2, 1935, requesting the return of the papers, and stated that if appellant wanted them returned he would do so with a bill for his services. On February 11, 1935, appellant wrote to Hamilton stating that as the latter thought the judgment would be hard to collect, her client, (Manton), felt it was useless for him to proceed further and accordingly the client instructed her to wire for the return of the papers with his bill. On February 14, 1935, Hamilton wrote appellant that the California judgment had been entered against Mrs. Gudger and he was returning the papers and expressed his regret that he was not to have the opportunity to collect the judgment; he fixed his fee at $200. The judgment was obtained on February 14, 1935. May 1, 1935, Hamilton by letter stated that in compliance with instruction the judgment had been lying dormant, and requested authority of appellant to accept an offer in respect to the judgment as follows: ''As the judgment now stands it amounts to $48,296.76 plus $11.00 costs. The judgment is NOT to be satisfied, but I wish you to authorize me to collect the money on the judgment, remit one-half of the amount collected to your office and apply the total amount collected against the judgment. I am to be permitted to retain one-half of the amount collected, a goodly portion of which must necessarily be paid out for the information I am receiving.

''I have been assured by the source of my information that in this manner the judgment can be collected and you will receive approximately $25,000.00. This will not in any manner, shape or form be a settlement of the judgment, but by running executions it is possible that we may secure the total amount of the judgment over a short period of time and may be able to get it all at one time. The execution will be run immediately upon receiving authorization from you.'' On May 11, 1935, appellant replied to the May 1st letter stating: ''I have carefully noted what you say with regard to levying execution. It appears from the contents of your letter that many levies may be necessary.

''What will insure collection after the first execution is levied?

''Can you clarify this?

''If so, kindly advise.'' Other correspondence followed. Hamilton receiving no replies from appellant, he wrote to

Manton for authority to collect the judgment. A reasonable inference can be drawn from that evidence that Hamilton and Hoornaert had not been unconditionally discharged. The clear implication therefrom is that the relationship still continued. There are also other factors to be considered. Hamilton's bill of $200 was never paid, appellant giving as the reason that he was to take it out of what he collected. Appellant never had Hamilton and Hoornaert substituted out of the action as attorneys. While an attorney may be discharged at any time, the failure to have the substitution made is a factor to be considered in determining whether there was a dismissal. Appellant testified that she sent a form of substitution to Manton and received it back, and that she sent it to Fendler (a counsel in California with whom she corresponded) to get Hamilton's signature. Although appellant called Hamilton from New York on the telephone and was later in Los Angeles, Hamilton testified: "Q. Did Miss Pugh ever say to you that she considered you discharged in the case? A. No, sir. . . . A. There was, from start to finish of this case never any change in the percent fee coming to Mr. Hoornaert and myself, other than the 10%. The balance of the fee was to be paid out for information, as was well discussed with Miss Pugh." Appellant's testimony on the subject was vague and contradictory. When a principal and agent relationship has been shown to have been created to exist for an indefinite length of time there is a presumption in favor of the continuance of the relationship. (*United States Farm Land Co.* v. *Darter*, 42 Cal.App. 292 [183 P. 696]; Code Civ. Proc., § 1963 (32); 3 C.J.S., Agency, § 316.)

 Appellant attacks the findings on damages asserting that the evidence is insufficient to support them. The court found that during the early part of December, 1938, plaintiff had two bona fide offers of $32,500 and $35,000 respectively, for the purchase of one of the parcels of plaintiff's property upon which the execution had been levied by purchasers ready, able and willing to purchase the property; the offers included the furniture in the house on the property valued at $2,500; that the purchasers would have purchased the property but for the execution lien; that since the date of the release of the execution in February, 1939, the property could not have been sold for a price in excess of $16,500, the market value thereof. Damages in the sum

of $16,000 were awarded. One of the prospective purchasers was Mr. Ibbett. It appears that on December 5, 1938, he made a written offer of $35,000 for the property providing plaintiff was in a position to give him "vacant possession and full title within . . . 48 hours." It cannot be said that the offer was impossible of performance because of the shortness of time inasmuch as plaintiff testified he could vacate within the period, and if he had clear title he would be in a "position" to deliver such title. Thus, Ibbett was ready and willing to purchase the property. That he was able is established by the evidence. He testified that his father was going to pay for a house for him and he would contribute part; that his father had substantial means and that he had $10,000 to $15,000 cash of his own. He was earning $25,000 per year. He did not buy the property because of the execution lien. The other prospective purchaser, Mrs. Beadles, upon being quoted a price of $35,000 by plaintiff, offered $32,500 which plaintiff said he would accept. She had securities worth several hundred thousand dollars. When informed by plaintiff of the execution, the transaction was dropped. Appellant's contention, that the offers were not bona fide and that there was no ability on the part of the purchasers to make the purchase, are largely directed at the credibility of the witnesses. While the evidence on this point could be more satisfactory, we are satisfied that it was sufficient. The credibility of witnesses and weight of the evidence are matters exclusively within the province of the trier of fact. Appellant relies upon such cases as *Mattingly* v. *Pennie,* 105 Cal. 514 [39 P. 200, 45 Am.St.Rep.87], and *Merzoian* v. *Kludjian,* 183 Cal. 422 [191 P. 673], as showing that the evidence was insufficient to show the ability of the prospective purchasers to fulfill their offer, because Ibbett particularly was relying upon receiving money from his father. Each case must be determined upon its particular facts, and here, Ibbett showed that he as well as his father had financial means, and that his father had agreed to purchase a home for him. The evidence was sufficient. In *Russell* v. *Ramm,* 200 Cal. 348, 353 [254 P. 532], this court said:

"As to the principles of law laid down in *Merzoian* v. *Kludjian, supra,* it may be conceded that they were correct as applicable to the facts of that case, but the rule therein declared which would require a would-be purchaser of prop-

erty to make a showing either that he had the purchase price on hand in the form of money or that he had consummated such a loan upon his available properties or securities in anticipation of the preparation and execution of the formal contract of purchase as would enable him to comply with its terms in advance of its execution, would be to lay down too drastic a rule governing business transactions of the kind presented in the instant case.''

Appellant questions the measure of damages applied by the court. The damages were predicated upon loss of sales of the property by reason of the levy of the execution, the court finding that bona fide offers were made in December, 1938, and that there was a decline in the market value of the property between then and February, 1939, at which time the execution was released, and its reasonable value at the latter time was $16,500. One offer was for $35,000 from which a deduction of $2,500 for the value of the furniture leaves $32,500. The latter figure less $16,500 leaves $16,000, the damages awarded. Appellant claims that the damages should have been the difference between the market value of the property at the time of the offers of purchase and the amount offered rather than between the amount offered and the market value at the time the execution was released. The value of the property is fixed, however, as of the time the execution was released, and during that time, from December, 1938, to February, 1939, the title to the property was affected by the execution. Under these circumstances we find no error in the assessment of damages.

Where as here, there have been losses of sales and a decline in the market value of property thereafter during the continuance of the disparagement of title (the execution lien here), defendant has not been injured when the court in fixing the damages selects the difference between the amount offered at the sales and the value of the property at the time the execution was released. That rule takes into consideration the effect of the defect in the plaintiff's title with relation to the fluctuation in the value during that time. Those principles have been applied in wrongful attachment cases. (See *Keystone Pipe & Supply Co.* v. *Crabtree,* 174 Okla. 562 [50 P.2d 1086]; *Nixon* v. *First State Bank,* 60 Tex.Civ. App. 7 [127 S.W. 882]; *Hoover* v. *First Nat. Bank,* (Tex. Civ.App.) 192 S.W. 1149; 7 C.J.S., Attachment, § 559.) In *Heath* v. *Lent,* 1 Cal. 410, there was no loss of sales by

reason of the wrongful attachment and the court seems to reason that the wrong did not cause the depreciation in the value of the property, and there being nothing to show that plaintiff's loss of his opportunity to sell during the continuance of the levy had affected him. In the tort in question the proper measure of damages is the amount which will compensate for all detriment proximately caused thereby. (Civ. Code, § 3333.)

Appellant contends that plaintiff failed to mitigate damages referring to a failure on the latter's part to communicate to the prospective purchasers the release of the execution. There was no obligation upon plaintiff's part to do so under the circumstances. After all attempts to obtain a release of the execution from defendants had failed, plaintiff commenced his action in January, 1939. The execution was levied in September, 1938, and not released until February, 1939.

The damages were clearly the proximate result of the disparagement of title by defendants. Ibbett, one of the prospective purchasers, testified: ''Q. And would you have purchased it if you could have had clear title? A. Yes.'' The other, Beadles, a life long friend of plaintiff, did not purchase the property after being informed by plaintiff of the execution. That the title to property would not be marketable by reason of the execution, is apparent. (See *Miller v. Price,* 103 Cal.App. 650, 654 [284 P. 1035].)

Appellant contends, however, that in an action for slander of title where the plaintiff refuses to sell the property because of the defect, the defendant is not liable; that plaintiff in advising the prospective purchasers of the execution was publishing the disparaging matter, which publication was the proximate cause of plaintiff's injury. With respect to Ibbett, he testified that he would not buy the property unless the title was clear. With the execution recorded there was an apparent defect. In regard to Beadles, plaintiff told her he would not sell because he could not give a clear title. She was a life long friend and certainly plaintiff was justified in not concealing the existence of the execution. He might well be committing fraud if he did not divulge the information or represented that the title was clear. He was justified in his dealing with prospective purchasers in advising them of the state of his title. That would not constitute a publication which would bar him from recovery.

The real publication, as we have seen, was the recording of the execution. Regardless of whether plaintiff had informed the purchasers of the execution, it was a matter of record, and it would in practically all instances be discovered by the prospective purchaser before the transaction was completely consummated. In *Burkett* v. *Griffith, supra,* the court was not concerned with a recorded instrument affecting the title. Further, it seemed persuaded that where a binding contract exists between the purchaser and plaintiff, and the disparaging matter induced the purchaser to breach his contract rather than preventing him from agreeing to purchase, the plaintiff had an adequate remedy against the purchaser. That reasoning is no longer valid inasmuch as an action will lie for inducing the breach of a contract by a resort to unlawful means such as libel or slander. (See *Imperial Ice Co.* v. *Rossier, supra.*) Nor is the case one where a republication by the plaintiff rather than defendants' publication is the proximate cause of the injury. The real publication here was the recording of the execution by defendants, a factor not involved in the ordinary case of libel and slander. A policy fostering the exercise of good faith and fair dealing would require the owner of property to inform a purchaser of what the record showed, although he would in all probability discover it in any event. In effect, plaintiff was placed in a position where good conscience would compel him to reveal the existence of an apparent defect in his title. It would not be questioned that a publication in a newspaper of the fact of the recording would not render the publisher liable to the owner of the property.

For the foregoing reasons, the findings are amended by adding thereto that the levy and maintenance of the execution by the defendants were without privilege or justification and not in good faith or in an honest belief that plaintiff's wife had an interest in the property on which the execution was levied.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., concurred.

Edmonds, J., did not participate herein.