**In re Robert O. POTTER, Debtor.**

**FEDERAL HOME LOAN MORTGAGE CORPORATION, Plaintiff,**

v.

**Robert O. POTTER, Defendant.**

**Bankruptcy No. SA 94–20671–JW.**
**Adv. No. SA 95–1278–JW.**

United States Bankruptcy Court,
C.D. California.

Aug. 3, 1995.

Jess R. Bressi, Colin S. Swainston, Paul D. Draper of Cox, Castle & Nicholson, Irvine, CA, for plaintiff.

Robert O. Potter, Laguna Hills, CA, pro se.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

Plaintiff Federal Home Loan Mortgage Corp. ("Freddie Mac") filed a complaint against the Defendant Robert O. Potter ("Potter") seeking a determination of the non-dischargeability of a $4.9 million fraud judgment ("fraud judgment") that was previously entered in Freddie Mac's favor by the District Court. Freddie Mac filed a Motion for Summary Judgment contending that Potter is collaterally estopped from relitigating the factual issues determined by the District Court. Potter filed a Cross–Motion for Summary Judgment, arguing that Freddie Mac's Non-dischargeability Complaint was not filed within the time limit set forth in Bankruptcy Rule 4007(c).

## I. STATEMENT OF FACTS

Freddie Mac is in the business of buying home mortgages and pooling them for resale as negotiable securities. Among the thousands of mortgage originators with whom Freddie Mac dealt was PFG Mortgage, Inc. ("PFG"). From 1985 to May 1990, PFG, under the direction of defendant Potter and a man named Hughes, regularly sold and serviced mortgages for Freddie Mac.

In a typical mortgage transaction, PFG made a loan to a borrower to purchase or refinance a home. The loan was taken out on a promissory note and secured by a deed of trust. After that, PFG sold the mortgage to an investor such as Freddie Mac. When it sold the mortgage to Freddie Mac, PFG assigned and delivered the promissory note. However, PFG was not required to and did not assign a deed of trust.

Between 1986 and March 1990, Potter and Hughes directed PFG to sell Freddie Mac a total of 42 home mortgages which were duplicates of mortgages that PFG had previously sold to other investors. This scheme of double-selling mortgages occurred as follows:

PFG originated and sold a home mortgage to an investor. PFG then sold the same mortgage to Freddie Mac. The promissory note assigned to Freddie Mac was either fabricated and forged or it was a copy of the original note which the borrower had mistakenly signed. Since PFG was not required to assign the trust deed, PFG's scheme went undetected. PFG also escaped detection by continuing to service the double-sold mortgages by sending Freddie Mac the monthly principal and interest payments as if nothing was out of the ordinary.

While the fraudulent scheme lasted, Potter and Hughes used the proceeds from the double-sold mortgages to finance the operation of PFG, to service other double-sold mortgages, to pay their and PFG's creditors and for their personal benefit. PFG stopped sending Freddie Mac monthly principal and interest payments on the double-sold mortgages in March 1990.

In March 1992, Freddie Mac initiated a fraud action against PFG, Potter and Hughes in the District Court of the Central District of California. After a three-day bench trial before the Honorable Lourdes G. Baird, the Court found that each and every element of fraud was satisfied. Judgement was entered in the amount of $4,931,422.15 on June 8, 1994. What ensued was long and frustrating post-judgment discovery.

In August 1994, in an effort to collect on its fraud judgment, Freddie Mac served on Potter a notice of deposition and a request for documents regarding his and his wife's assets. Potter did not respond to the document request nor did he show up at the deposition. Freddie Mac filed a Motion to Compel Discovery and for Sanctions ("first discovery motion"). The hearing was set for November 22, 1994.

Unbeknownst to Freddie Mac, on October 21, 1994, Potter filed his Chapter 7 bankruptcy petition. A Notice of Commencement of Chapter 7 was sent to Freddie Mac's headquarters, located in McLean, Virginia ("the McLean office"), but not addressed to an officer, agent for service, or any particular person. Freddie Mac received the notice on or about November 11, 1994. The bar date for creditors to file complaints to determine dischargeability of debts was set at January 30, 1995.

On November 22, 1994, the hearing on Freddie Mac's first discovery motion took place. Despite the fact that Potter had filed for bankruptcy nearly a month earlier, Potter did not disclose his bankruptcy to Freddie Mac's counsel or to the magistrate judge who was hearing Freddie Mac's first discovery motion. Potter did not assert the automatic stay in response to Freddie Mac's debt collection efforts. The magistrate judge, who was unaware of the existence of Potter's bankruptcy case, ordered that Potter produce the documents requested by Freddie Mac as well as appear for a deposition on December 9, 1994.

Freddie Mac's counsel, who was not aware of Potter's bankruptcy, attempted to enforce the magistrate judge's discovery order. On November 29, 1994, counsel for Freddie Mac wrote Potter to remind him of his legal obligation to follow the magistrate judge's discovery order. Moreover, through three separate telephone conversations on December 1, 1994, Freddie Mac's counsel advised Potter to comply with the discovery order.

The deposition of Potter was conducted on December 9, 1994, at which time Freddie Mac was still uninformed of the Bankruptcy, and Potter failed to reveal it. The following is an excerpt of the exchange between Freddie Mac's counsel and Potter during the December 9 deposition:

Q. ... Mr. Potter, are you presently contemplating filing a petition in the bankruptcy court?

A. Am I presently contemplating that? No.

Q. I received correspondence from you some time ago indicating that you were working on a bankruptcy petition. Are you in fact working on a bankruptcy petition at this time?

A. No.

. . . .

Q. Have you at all done any work in the last 12 months with respect to filing a bankruptcy petition?

A. Yes.

Q. What work have you undertaken in that regard?

. . . .

A. Okay, just finding out where I was on assets versus liabilities.

Q. Is that it?

A. Yes.

(Potter's Deposition, pp. 9–12).

In response to the magistrate judge's first discovery order to produce documents (which would have revealed his bankruptcy filing), Potter responded by merely handing over

some innocuous insurance policies for his car and house. Consequently, on January 11, 1995, Freddie Mac was forced to file a second Motion to Compel Discovery and for Sanctions ("second discovery motion").

As stated above, Potter's bankruptcy filing did cause the Notice of Commencement of his Chapter 7 to be sent to Freddie Mac's McLean office. On January 9, 1995, a paralegal from Freddie Mac's McLean Office, Ms. Garner, wrote a letter to Potter in response to the notice of the bankruptcy. It is clear from the letter that Ms. Garner did not recognize who Potter was or how he was actually connected to Freddie Mac. The letter indicated that Freddie Mac had questions for Potter relating to "identifying the mortgage loan, address, any loan number, etc." Ms. Garner thought that Potter was a bankrupt borrower of a home loan rather than a judgment debtor.

Upon receiving Ms. Garner's letter, Potter still did not inform Freddie Mac's counsel of the existence of his bankruptcy case. Instead, Potter allegedly sent a letter, dated January 16, 1995, to the McLean office in Virginia to explain that he was not a bankrupt mortgage borrower, but a judgment debtor. Freddie Mac contends that it never received this letter from Potter and that there is no record of it in their files.

One week later on January 24, 1995, Freddie Mac's counsel wrote to Potter to notify him that the hearing on the second discovery motion had been continued one day. Potter did not assert the automatic stay. It was not until February 6, 1995 (seven days after the deadline for Freddie Mac to file its non-dischargeability complaint and thirteen days after the deadline for Potter to file his opposition to Freddie Mac's second discovery motion) that Potter finally informed Freddie Mac's counsel that he had already filed bankruptcy and asserted the automatic stay in his untimely filed opposition. Upon being informed of this, Freddie Mac promptly filed its Non-dischargeability Complaint on February 16, 1995. Potter argued that this Complaint was time-barred by Bankruptcy Rule 4007(c) because it was not filed within sixty days following the first date set for the § 341(a) hearing, i.e. January 30, 1995.

## II. DISCUSSION

### A. JURISDICTION TO CONSIDER EQUITABLE RELIEF

Bankruptcy Rule 4007(c) dictates that "[a] complaint to determine the dischargeability of any debt pursuant to § 523(c) ... shall be filed not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a)...." It has been contended by debtors in several cases that a creditor's failure to comply with this time limit deprives the court of subject matter jurisdiction which cannot be waived by the equitable estoppel doctrine. However, this argument has been rejected by the Ninth Circuit Bankruptcy Appellate Panel in *In re Santos*, 112 B.R. 1001 (9th Cir. BAP 1990) and *In re Halstead*, 158 B.R. 485 (9th Cir. BAP 1993), *aff'd*, 53 F.3d 253 (9th Cir.1995).

In *In re Santos*, the creditor's complaint to determine dischargeability of debt was untimely filed because he had relied upon the agreement of the debtor's counsel to extend the bar date. The bankruptcy court dismissed the complaint as untimely and ruled that the equitable doctrine of waiver was not applicable. On appeal, the Bankruptcy Appellate Panel addressed whether compliance with the time limits of Rules 4007(c) and 4004(a) is a prerequisite to the bankruptcy court's jurisdiction to hear a dischargeability action or an objection to discharge. The BAP examined the text and legislative history of 28 U.S.C. § 1334, 28 U.S.C. § 157 and 11 U.S.C. § 523(c) and determined that the statutes did not limit jurisdiction to only those cases where the complaint is timely filed. The BAP concluded that "the time limits set forth in Rules 4007(c) and 4004(a) are not jurisdictional requirements. Any application of equitable doctrines, however, must be consistent with the language and purposes of the Rules." *Id.* at 1009.

In *In re Halstead*, 158 B.R. 485 (9th Cir. BAP 1993), *aff'd* 53 F.3d 253 (9th Cir.1995), the creditor's complaint to determine dischargeability of debt was filed late because he had relied upon an erroneous bar date notice. The question was whether equitable estoppel was applicable to rescue the credi-

tor's untimely complaint when the erroneous notice was originally issued by the bankruptcy court, but was later vacated before the amended bar date had passed. As a preliminary matter, the Bankruptcy Appellate Panel discussed the jurisdictional effect of the untimeliness factor on the bankruptcy court's power to hear the case. The BAP stated that "compliance with the deadline is not a jurisdictional prerequisite and a court may apply equitable doctrines to relieve a party from a failure to strictly comply with the time limits in limited circumstances." *Id.* at 487. Although the BAP did not define these limited circumstances, one of them is apparently the reasonableness of the creditor's failure to meet the deadline because the *Halstead* creditor was granted equitable relief due to his reasonable reliance upon the mistaken notice. In summary, *Santos* and *Halstead* show there is no absolute jurisdictional bar to application of the equitable estoppel doctrine with regard to an untimely non-dischargeability complaint.

## B. EQUITABLE ESTOPPEL

 Before equitable estoppel may be applied, five elements must be established: (1) a representation or concealment of material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party actually ignorant of the truth; (4) with the intention that the latter act upon it; and (5) the party must have been induced to act upon it. *In re Car-Gill, Inc.*, 125 B.R. 133, 138 (Bankr. E.D.Penn.1991) (quoting *In re Webb*, 99 B.R. 283, 290 (Bankr.E.D.Pa.1989)); *In re Marriage of Recknor*, 138 Cal.App.3d 539, 546, 187 Cal.Rptr. 887, 892 (1982); *Goldstein v. Ray*, 118 Cal.App.3d 571, 577, 173 Cal.Rptr. 550, 553 (1981); 30 Cal.Jur.3d, Estoppel and Waiver § 6.

### (1) Representation or concealment of material facts

 The first element requires proof that Potter misrepresented his bankruptcy case to Freddie Mac. The clearest evidence of Potter's misrepresentation lies in the transcript record of the December 9 deposition. The portion of the transcript excerpted above shows that Freddie Mac's counsel asked Potter if he was "contemplating filing a petition in the bankruptcy court." (Potter's Deposition, p. 9). To this question, Potter flatly answered, "No." (Potter's Deposition, p. 9). While technically accurate, this answer was so grossly misleading that the court finds it to be an intentional and fraudulent concealment of a material fact. Further, Freddie Mac's counsel asked Potter if he had done any work in the last year with respect to filing a bankruptcy petition. (Potter's Deposition, p. 11). To this question, Potter unequivocally answered that he had only determined the amount of his assets and liabilities and nothing else. (Potter's Deposition, p. 11). This was a blatant lie.

Potter's answers during the December 9 deposition were clearly false. Potter had filed his Chapter 7 petition on October 21, 1994, almost two months prior to the date of the deposition. This required him to do far more than "just finding out where I was on assets versus liabilities." (Potter's Deposition, p. 11). Clearly, Potter was obligated to reveal his bankruptcy filing to Freddie Mac's counsel when these unambiguous questions were directed at him.

In addition to the affirmative misrepresentations, equitable estoppel may also arise from nonverbal conduct short of words. In *Crittenden v. McCloud*, 106 Cal.App.2d 42, 234 P.2d 642 (1951), a woman forged her husband's signature in a gift deed, which purported to transfer her husband's half interest in the family home to her. Subsequently, she acquired sole ownership of the home and sold it to another person. Although her husband had not participated in the forgery of the gift deed or the sale of the home, he knew about the fraud after the sale and used the proceeds of the sale for his benefit. The husband later attempted to void his wife's sale of the home and to transfer his half interest in the home to his attorney. The Court held that the husband had an obligation to reveal his wife's forgery to the original purchaser because he had benefited from the sale, knowing it was based on a forged deed. Since the husband remained silent when the purchaser asked him when he and his wife would move out of the home, this obligation was breached. Consequently,

the husband was equitably estopped from later voiding the sale on the basis of the forged deed.

In *Altman v. McCollum*, 107 Cal.App.2d Supp. 847, 236 P.2d 914 (1951), the borrowers of a home loan failed to pay an installment of taxes and the principal for the month of March. The lender then recorded a notice of default. The lender refrained from mailing the borrowers a copy and never mentioned to them that she had recorded the notice of default. As a result, the borrowers did not become aware of the impending sale of their home until the time limit during which they could reinstate their loan expired. Meanwhile, the borrowers continued to pay the principal for the months of April through July and the lender accepted and credited these payments. In a letter written after the lender had recorded the notice of default and after she had credited the post-default payments, the lender reminded the borrowers about the unpaid taxes but mentioned nothing about the notice of default.

The *Altman* court found that the scenario had all the elements of equitable estoppel. The lender's acceptance of the post-default payments obligated her in good conscience to tell the borrowers of her action in recording the notice of default while there was time for them to reinstate the loan. She knew that the borrowers would lose their right to reinstate the loan if she could only keep them in ignorance of her action until three months had elapsed. She had ample opportunity to speak, but did not do so. When she did speak, she did not make a full disclosure of the facts respecting the defaults, which lulled the borrowers into believing that their loan was still in good standing. Because her conduct and silence lulled the borrowers into a false sense of security, the lender was estopped from going ahead with the foreclosure sale.

Potter's deliberate silence regarding his previously filed bankruptcy during the post-judgment discovery proceedings is sufficient to raise an equitable estoppel. Throughout those proceedings, Potter kept silent about his bankruptcy even though he had ample opportunity to reveal it. Potter did not assert the automatic stay during the proceedings on the first discovery motion when it was the opportune time to do so. He should have produced his bankruptcy petition and schedules in response to the order of the magistrate judge, instead of exhibiting recalcitrance and producing only insurance policies for his car and home. Instead of being forthright to Freddie Mac's counsel about the existence of his bankruptcy case, Potter was evasive regarding the matter.

The case at bench is similar to *In re Raanan*, 181 B.R. 480 (Bankr.C.D.Cal.1995). The debtor in *Raanan* had filed a claim with the Contractors State License Board against his subcontractor. Two weeks later, he filed a Chapter 7 bankruptcy petition. The debtor did not, however, list his contingent claim against the subcontractor as an asset or list the subcontractor as a creditor; nor did he disclose the pending State License Board proceedings.

The debtor's claim was subsequently referred to binding arbitration where the matter was resolved in favor of the subcontractor. The subcontractor was awarded $12,500 on a counterclaim against the debtor. Before the subcontractor could apply to the state superior court for an order confirming his award, the debtor's discharge was entered. The subcontractor discovered the existence of the debtor's bankruptcy and discharge for the first time when the debtor filed a "Notice of Bankruptcy Stay" to oppose the subcontractor's application to confirm the award. Relying upon the notice of automatic stay, the debtor did not appear at the hearing on the subcontractor's application for award confirmation. The Superior Court decided to confirm the award despite the notice of automatic stay. Subsequently, when the subcontractor attempted to enforce his judgment, the debtor filed a Motion for an Order to Show Cause re Contempt in the bankruptcy court, alleging that the subcontractor's collection efforts violated the discharge order. The debtor argued that the subcontractor's award was a discharged debt even though he did not list the subcontractor as a creditor, schedule the debt or give the subcontractor notice of the bankruptcy case.

*Raanan* is instructive in regards to the kind of interpretation that should be placed

on Potter's conduct following the filing of his bankruptcy. The Honorable Lisa Hill Fenning specifically stated:

The debtor's vice in this case [was] not merely his intentional omission of this debt from the schedules, but also his post-petition conduct in litigating his claim ... to judgment without disclosing the pendency of the bankruptcy case. If [the subcontractor] had known about the pending bankruptcy, he and the arbitrator would have both been on notice—before the litigation proceeded—that the Chapter 7 trustee might well be the real party in interest in prosecuting the claim against [the subcontractor], and that the automatic stay would preclude any counterclaim or collection actions or judgments against [the debtor] personally.

*Id.* at 484.

Judge Fenning concluded that application of equitable estoppel was appropriate because the debtor did not list his disputed claim against the subcontractor, as required by the Bankruptcy Code, nor did the debtor inform the subcontractor of his pending bankruptcy. Since the debtor failed to notify the subcontractor of his bankruptcy filing in time for the subcontractor to minimize his litigation costs, Judge Fenning did not allow the subcontractor's debt to be discharged.

As with the debtor in *Raanan*, Potter's silence was improper. In light of the pending discovery proceedings, Potter should have told Freddie Mac's counsel about his bankruptcy shortly after the petition was filed. Had he done so, the post-judgment discovery phase could have been terminated and Freddie Mac would not have incurred unnecessary legal costs. However, Potter did not disclose his pending bankruptcy. Instead of asserting the automatic stay, he kept quiet. Instead of producing his bankruptcy petition and schedules, he withheld them. Potter's silence and refusal to produce his bankruptcy petition and schedules caused Freddie Mac to believe that there was no open or pending bankruptcy case.

The discussion thus far established that, through both affirmative statements and silence, Potter represented to Freddie Mac's counsel that he had not filed bankruptcy.

Thus, the first element of equitable estoppel is satisfied.

*(2) The misrepresentation or concealment is made with knowledge, actual or virtual, of the facts*

As for the second element, it must be shown that Potter made this representation knowing that Freddie Mac's counsel was unaware of his bankruptcy case and the bar date to file a non-dischargeability complaint. That Freddie Mac's counsel was unaware of Potter's bankruptcy must have been clear to Potter since counsel had to depose him in order to learn about the existence or nonexistence of his bankruptcy. As to Freddie Mac's McLean office, even after they received Potter's Notice of Commencement, Freddie Mac could not connect Potter to the fraud judgment, as evidenced by the substance of Ms. Garner's letter. Thus, Freddie Mac was ignorant of the fact that Potter had taken action which could derail their collection of the $4.9 million judgment. This ignorance could not have been lost on Potter. A creditor with full knowledge of his debtor's bankruptcy filing and bar date would not have reasonably engaged in extensive post-judgment discovery in violation of the automatic stay and would not have delayed filing a non-dischargeability complaint. This is especially true where the creditor held a multi-million dollar fraud judgment debt. Therefore, Freddie Mac's conduct must have tipped Potter off to the fact that Freddie Mac did not know of his bankruptcy or the bar date.

Moreover, from the Notice of Commencement of his Chapter 7, Potter must have known that if Freddie Mac did not file a non-dischargeability complaint on or before the bar date then its $4.9 million fraud judgment would be discharged. In sum, Potter knew that Freddie Mac's counsel was not aware of the existence of his bankruptcy, that this lack of knowledge could cause Freddie Mac to delay filing a non-dischargeability complaint until the bar date passed, and that an untimely complaint would technically cause the $4.9 million fraud judgment to be discharged. Knowing all this, Potter represented to Fred-

die Mac's counsel, in words and silence, that he had not filed bankruptcy.

### (3) Plaintiff was actually ignorant of the truth

The third element of equitable estoppel requires a showing that Freddie Mac's counsel was actually ignorant of Potter's bankruptcy filing. The previous discussion regarding the second element of equitable estoppel already established this point. The only matter to be discussed is the receipt of Potter's Notice of Commencement of Case by Freddie Mac's McLean office. Although Freddie Mac received the Notice, which indicated that a "Robert O. Potter" had filed bankruptcy, the Notice did not give Freddie Mac any indication of Potter's relation to Freddie Mac. The substance of Ms. Garner's letter made it clear that Freddie Mac was confused about Potter's identity and that Freddie Mac could not connect Potter's bankruptcy filing with the $4.9 million fraud judgment in Los Angeles. Thus, although Freddie Mac's McLean office received Potter's Notice of Commencement of Case, it was unaware of Potter's true identity and Freddie Mac's counsel in Los Angeles was actually unaware of Potter's bankruptcy.

### (4) Defendant intended that the Plaintiff act upon his misrepresentation or concealment

In order to satisfy the fourth element of equitable estoppel, it must be shown that Potter engaged in misleading words or silence with the intent that Freddie Mac act upon it. Clearly, had Potter informed Freddie Mac's counsel of his bankruptcy filing and asserted the automatic stay as an ordinary debtor, he would have gained the protection of the automatic stay. However, he chose not to assert this valuable protection by remaining silent. The only logical motive for this anomalous decision is that Potter intended to keep Freddie Mac unaware of his bankruptcy case.

### (5) Plaintiff was induced to act upon Defendant's misrepresentation or concealment

The fifth element of equitable estoppel requires a showing that Freddie Mac was, in fact, induced by Potter to refrain from timely filing a non-dischargeability complaint. The causal connection between Potter's misleading statements and silence and Freddie Mac's untimely complaint is clear. The record reveals that Freddie Mac was diligent in filing its complaint once it was notified of the bankruptcy. Absent Potter's conduct, Freddie Mac would have filed its complaint timely. Thus, Freddie Mac's untimely complaint was caused by Freddie Mac's reliance on Potter's misrepresentation.

The facts of this case indicate that Potter had acted improperly during the post-judgment discovery phase. On at least one occasion, he made affirmative misrepresentations regarding the existence of his bankruptcy. Moreover, by choosing not to reveal his pending bankruptcy when the circumstances, in good conscience, required it, Potter has caused Freddie Mac to be misled to the point where Freddie Mac faced the risk of discharge of the $4.9 million fraud judgment that it had obtained through two long years of litigation. It would now be inequitable to allow Potter to assert the time bar. Therefore, this court holds that Potter is equitably estopped from invoking Bankruptcy Rule 4007. Freddie Mac may pursue its complaint, notwithstanding its late filing.

## C. COLLATERAL ESTOPPEL

Freddie Mac has moved for summary judgment contending that Potter is collaterally estopped from relitigating the factual findings of fraud found by the District Court. Collateral estoppel applies in dischargeability proceedings. *In re Bugna,* 33 F.3d 1054 (9th Cir.1994). In determining the collateral estoppel effect of another court's findings of fact, federal courts must apply that state's law of collateral estoppel. *Id.* (citing 28 U.S.C. § 1738); *see In re St. Laurent,* 991 F.2d 672 (11th Cir.1993) (upholding the application of state law of collateral estoppel in a bankruptcy case). Thus, to see the effect of the District Court's finding of fraud on the dischargeability of the $4.9 million debt, this Court will look to California's law concerning collateral estoppel.

■ Collateral estoppel bars relitigation when (1) the issue decided in the prior action is identical to the issue presented in the second action; (2) there was a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party to the prior action. *Garrett v. City and County of San Francisco*, 818 F.2d 1515 (9th Cir.1987).

■ The issue that was before the District Court, like the issue that is now before this court, is whether Potter defrauded Freddie Mac. The District Court's Findings of Fact and Conclusions of Law meticulously found each element of fraud was proven. Specifically, the District Court found:

> ... that misrepresentations of material facts were made by PFG when PFG, at Potter's direction, offered to sell and sold non-existent mortgage loans to Freddie Mac ... [;] that Potter consciously deceived Freddie Mac by having PFG offer to sell ... non-existent mortgages ... to Freddie Mac which PFG represented were actual mortgages ... [;] that Potter ... acted with the intent to deceive ... [;] that Freddie Mac relied upon PFG's representations....

(District Court's Findings of Fact and Conclusions of Law, p. 18). In summary, the District Court concluded that Potter defrauded Freddie Mac and that this fraud caused Freddie Mac damages in the amount of $4,931,422.15. The Bankruptcy Code excepts from discharge any debt incurred through "false pretenses, a false representation, or actual fraud". 11 U.S.C. § 523(a)(2)(A). Thus, a determination that the $4.9 million debt should not be discharged necessarily requires that the debt was incurred by fraud. Since fraud was the issue in the District Court action as well as the issue in this case, the two issues are identical.

The second prong of collateral estoppel requires a showing that there was a final judgment on the merits of the fraud action in the District Court. There was no default judgment but instead a three-day bench trial in which Potter was present to defend himself. Thus, the issue of fraud has been determined by a final judgment on the merits in the District Court.

Similar to the second prong, the third prong is easily met because Potter (the party against whom collateral estoppel is being asserted) was a defendant in the District Court action.

Given that all three prongs of collateral estoppel have been satisfied, Potter may not relitigate the issue of fraud in this action. The fraud issue has already been decided in favor of Freddie Mac by the District Court and it will remain undisturbed. Because it has already been decided that the $4.9 million was obtained through fraud, this judgment debt is now held to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

### III. CONCLUSION

This memorandum of decision contains this Court's findings of fact and conclusions of law. Counsel for the Plaintiff shall lodge and serve a judgment consistent with this memorandum of decision.