Court will enter a separate order which is consistent with this Memorandum Decision.

In re Philip SIMONIS, d/b/a Artistic Construction, d/b/a Simonis Construction, Debtor.

Ethan D. BROWN, Plaintiff,

v.

Philip SIMONIS, d/b/a Artistic Construction, d/b/a Simonis Construction, Defendant.

Bankruptcy No. 96–01433–JH. Adv. No. 96/90291.

United States Bankruptcy Court, S.D. California.

March 19, 1997.

Daniel J. Winfree, San Diego, CA, for Defendant.

Richard R. Ravreby, Ravreby, Shaner & Gibson, Carlsbad, CA, for Plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, after due notice, trial was held on December 2, 1996, on the Complaint to Determine Debt to be Nondischargeable filed by Plaintiff, Ethan D. Brown ("Brown") against Debtor/Defendant, Philip Simonis ("Simonis"), on May 6, 1996. The complaint alleges several grounds for non-dischargeability of Brown's claims. At trial, however, Brown presented a case based solely on 11 U.S.C. § 523(a)(6). Both parties appeared represented by counsel. The parties first argued their respective positions on Brown's motion for summary judgement, dated November 11, 1997, and received by the Court on November 12, 1997. At close of oral arguments the Court found that at least one outstanding issue of material fact remained—to wit, whether Simonis injured Brown without just cause or excuse—and denied the motion for summary judgment. Brown testified on his own behalf, and introduced the testimony of Simonis. Simonis testified in defense. Exhibits 1–8, 9A–9M, 10, 12–17, 18A–18B, 19, 20, and 22, as well as A, B and D, were admitted into evidence. At close of trial the Court granted the parties ten days to submit proposed findings of fact and conclusions of law. Such filing deadline having now passed, the matter stands ripe for decision. Upon review of the record, the Court finds for Simonis.

### I. FINDINGS OF FACT

Simonis and Brown entered into a written contract in which Simonis agreed to perform certain renovations on Brown's home in Ramona, California. (Exhibits 1A and 1B). Simonis signed the writing on May 3, 1993, as "General Contractor." Notwithstanding this designation, however, Simonis testified, and Brown does not dispute, that Simonis prepared the contract pro forma to satisfy the lender financing Brown's remodel. (Tr. p. 103). In performing the contract, Brown acted as the "owner/builder," obtain any permits and disbursing all funds for supplies, materials and labor. Simonis acted as subcontractor hiring laborers and supervising

work on the ground. (Tr. p. 104). In his role as owner/builder, Brown followed the terms of the written agreement only roughly. When making purchases, Simonis testified without dispute that Brown often upgraded building materials. Simonis seldom had control or prior knowledge over Brown's choice of materials and supplies. When Simonis did make purchases, Brown would reimburse him only if he provided a receipt.

The written terms of the contract provide Brown would pay Simonis $38,260 for work described in the writing. (Tr. p. 18; Exhibits 1A and 1B). The agreement also contemplated amendment of the contract price based on extras and other changes that Brown might request, providing for written modification if such changes occurred. The parties did not honor these provisions. (Tr. p. 103–104). The contract provided for progress payments, which the parties recorded on the back of the document. Next to each entry appears Simonis' initials. (Tr. p. 75; Exhibit 1B). By October 1, 1993, Brown had made a total of $45,931.03 in progress payments, (Tr. p. 21; Exhibit 1C), when the parties met to discuss progress on the renovation. (Tr. p. 22). At the meeting, Simonis told Brown that Simonis should have the work finished in a week or two. Then, Brown added up the totals paid on the contract, and for the first time realizing how much he had spent on the project, informed Simonis that Brown had overpaid him, and that Simonis would have to complete the job without further remuneration.

On October 5, 1993, after Simonis continued to ask for additional payments, Brown sent Simonis a letter outlining Brown's position. (Tr. pp. 23, 76; Exhibit 3). Upon receipt of this letter, Simonis left the job. Later, on October 14, 1993, Simonis made a written response to Brown's assertions of overpayment, calculating that, because of changes in the original contract requested by Brown, Simonis had put $2,142.00 worth of extras into the job. (Tr. p. 24, 76–77; Exhibit 4). Brown wrote back to Simonis in reply to these assertions on October 18, 1993. (Tr. pp. 24, 77; Exhibit 5). The letter informed Simonis that even with the extras, Brown had still overpaid him by $4,236.00, and that

the contract listed at least a dozen items Simonis had failed to finish. (Exhibit 5).

In the meantime, after Simonis walked off the project, Brown reported Simonis conduct to the state board overseeing contractor licensing. (Tr. p. 24). The board told Simonis to get back on the job and finish the work. (Tr. p. 78). As a result of Brown's report to the state board, Simonis and Brown negotiated a "finish agreement." (Tr. pp. 25, 78–79; Exhibit 6). In the agreement, Brown and Simonis specify, as of October 26, 1993, a list of 13 "items to be completed for the satisfaction of the contract" between the two "signed May 3, 1993." (Exhibit 6). No mention appears in the finish agreement, however, of any additional monies owed Simonis by Brown on the contract. The only mention of further payments appears in the provisions for payment $1,000.00 to Simonis if he completes the 13 items before November 10, 1993, with an exception for inclement weather. Invocation of the weather exception eventually extended the completion date to December 5, 1993. (*Id.*) In negotiating the agreement, Simonis never raised an issue of whether Brown owed him any money under the original construction contract. (Tr. pp. 26, 80). In addition, the two signed no other written agreements in connection with the project. (Tr. pp. 31, 79).

Finally on December 16, 1993, with the work provided for in both the May contract and the October finish agreement still not completed, Brown sent Simonis a letter of termination. (Tr. pp. 30, 81; Exhibit 7). On December 17, 1993, the contractor's license board issued a report indicating that it would take $11,000 worth of labor and material to finally complete Brown's remodel. While Brown claims the board sent a copy of the report to Simonis, Simonis does not admit this. (Tr. pp. 31, 82). Simonis did, however, offer an explanation of a sort concerning the report, saying "that's how much it cost to finish the job, but that wasn't what I had to finish." (Tr. p. 80). This statement implies that Simonis thought he had finished the part of the construction he bore responsibility for under the May and October agreements.

On February 17, 1994, despite his awareness of Brown's claim that he had been over-

paid on the contract, Simonis filed a mechanic's lien (referred to hereinafter as "the first lien") for $12,560.00 against Brown's home. (Exhibit 12). Simonis filed this lien without adequately documenting the figure Simonis claimed Brown still owed. (Tr. p. 85). Then on March 28, 1994, Simonis sent a letter to counsel for Brown offering to withdraw the lien on Brown's home in exchange for Brown's withdrawing a complaint to the contractors license board. (Tr. p. 93; Exhibit 14). The offer of settlement contains no indication whatsoever that Brown owed Simonis money.

Nevertheless, Simonis did bring to Brown's attention Simonis' contention that Brown still owed monies for work Simonis had done. On October 21, 1993, Simonis prepared a document totaling these numbers. (Exhibit D). The figures in Exhibit D, added to those of Exhibit 4, equal $11,591.64 in specific extras, all of which Simonis conferred with Brown about on or before October 21, 1993. (Tr. pp. 113–115). Moreover, Simonis failed to adequately document the first lien because Brown refused to provide an accounting of the materials purchased and work done. (Tr. p. 87, 115; Exhibit 18B). Then on May 9, 1994, Simonis filed another mechanic's lien on Brown's home, (referred to hereinafter as "the second lien"), in the amount of $17,373.50, which Simonis based on additional information, in the form of copies of checks written by Brown. (Exhibit B).

Thus, as of May 10, 1994, Simonis had filed almost $30,000 worth of liens against Brown's residence. Simonis explained, however, that he never intended to file $30,000 in liens against Brown's title. (Tr. p. 132). Simonis filed the second lien in an effort to simply replace the first lien, which, based on his accounting using Exhibit B, Simonis thought was for too little money. This effort to amend failed because of errors in filing on Simonis' part. No evidence appears in the record to refute Simonis' explanation.

Despite the implication Brown has attempted to portray, that Simonis filed his liens solely as leverage against Brown on his complaint to the contractor's license board, knowing Brown owed him nothing, the Court finds from the record that Brown failed to show that Simonis filed the first lien against Brown's home without believing genuinely that Brown owed him over $12,000.00 on the work Simonis had done on Brown's residence. In addition, the Court finds Brown failed to show that Simonis filed the second lien without believing genuinely, based on information later obtained, that Brown actually owed him over $17,000 instead of $12,-000. Finally, Brown has failed to show that Simonis filed the two liens redundantly, for a total of $30,000, against Brown's title through other than mere inadvertence on the part of Simonis.

## II. CONCLUSIONS OF LAW

■ The Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This is a core proceeding for purposes of § 157(b)(2)(i). On the issue of the determination of non-dischargeability of debts, the Ninth Circuit imposes a "weighty burden" on creditors, strictly construing exceptions to discharge in order to further Congress' policy of affording debtor's a fresh start. *In re Rahm*, 641 F.2d 755, 756–57 (9th Cir.1981); *Quarre v. Saylor (In re Saylor)*, 178 B.R. 209, 214 (9th Cir. BAP 1995); *McCrary v. Barrack (In re Barrack)*, 201 B.R. 985, 989 (Bankr.S.D.Cal.1996). Notwithstanding the weighty burden, however, in order to prevail, a plaintiff need only establish the elements of a § 523 action by a preponderance of the evidence. *See, Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The burden falls on the creditor to prove that an injury underlying a creditor's claim was both "willful" and "malicious." *In re Posta*, 866 F.2d 364, 367 (10th Cir.1989).

With regard to a defendant's state of mind required to support a § 523(a)(6) claim, the Ninth Circuit, has held: "[W]hen a wrongful act ..., done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure."

*Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1442–1443 (9th Cir.1986) (citations omitted); *Bond's Jewelers, Inc. v. Linklater (In re Linklater),* 48 B.R. 916 (Bankr.D.Nev.1985) (the court reasoned "[t]he term 'willful and malicious', as used in § 523(a)(6), does not necessarily mean ill will, spite, or personal hatred. An act injuring the property interests of another is willful and malicious for § 523(a)(6) purposes if it is without knowledge or consent, intentional, and unjustified or unexcused.").

■ Furthermore, under California law, the "malice, express or implied" element of an action for slander of title echoes the "malicious" element of a § 523(a)(6) action. *Howard v. Schaniel,* 113 Cal.App.3d 256, 262, 169 Cal.Rptr. 678 (Cal.Ct.App.1980). "Malice implied in law" consists of the marring of title to property with a false filing, done in good faith, but without legal privilege to do so. *Gudger v. Manton,* 21 Cal.2d 537, 543, 134 P.2d 217, 221 (Cal.1943). In *Gudger,* the court defined privilege or justification in the slander of title context thus:

> A privileged publication is one made— * * * 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information.

*Gudger,* 134 P.2d at 222. The court then elaborated:

> A rival claimant of property is conditionally privileged to disparage or justified in disparaging another's property in land by an honest and good-faith assertion of an inconsistent legally protected interest in himself. See *Thompson v. White,* 70 Cal. 135, 11 P. 564; Restatement, Torts, § 647. The levy of an execution is an assertion of a claim to an interest in that it is a lien on the property levied upon.

*Id.* Thus, the filing of a mechanic's lien against title to property in the good faith belief that the owner owes the filer money is a privileged act under *Gudger* and an act

with just cause or excuse under *Cecchini.* The *Gudger* ruling also instructs, however, that actual bad faith will support a slander of title action regardless of the filer's privilege. *Id.*

■ Analyzing the facts *sub judice* in light of the foregoing, the Court concludes that Brown failed to show by a preponderance of evidence that Simonis filed liens against Brown's title without a subjective good faith belief—based, after Brown deliberately withheld cooperation and an accounting, upon investigation performed to the best of Simonis' ability—that Brown owed him the face amounts shown on the liens. Furthermore, the evidence Brown presented did not establish that Simonis intentionally or in bad faith inflated the impairment against Brown's title by filing the duplicate liens intentionally or by other than innocent mistake. Thus, Brown failed to demonstrate either that Simonis filed each individual lien without the just cause of subjectively believing Brown owed him funds, or that Simonis filed the cumulative liens with intent to do so. As a result, the evidence establishes neither maliciousness with regard to the former acts, nor willfulness with regard to the latter. Consequently, Brown's allegations lodged under 11 U.S.C. § 523(a)(6) must fail.

Finally, Brown has alleged that this Court should give collateral estoppel effect to a San Diego Municipal Court's decision against Simonis for slander of title. In support of this argument, citing *In re Potter,* 185 B.R. 68, 75 (Bankr.C.D.Cal.1995) and *Garrett v. City and County of San Francisco,* 818 F.2d 1515 (9th Cir.1987), Brown asserts that "collateral estoppel bars relitigation when (1) the issue decided in the prior action is identical to the issue presented in the second action; (2) there was a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party to the prior action." (Pl.'s Mem. of Points and Authorities in Supp. of Mot. for Summ.J., p. 8). This, however, is a statement not of California's doctrine of collateral estoppel, otherwise known as issue preclusion, but of California's rules for application of *res judicata,* or claims preclusion. *Bernhard v. Bank of America,* 19 Cal.2d 807, 813, 122 P.2d 892, 895 (Cal.

1942) ("In determining the validity of a plea of *res judicata* three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?"); *see Heath v. Cast,* 813 F.2d 254, 258 (9th Cir.1987); *Raymond v. Pickering (In re Pickering),* 182 B.R. 268 (Bankr.D.Mont. 1995).

As the California Court of Appeal has had occasion to clarify:

As was stated in *Henn v. Henn* (1980) 26 Cal.3d 323, at pages 329–330, 161 Cal.Rptr. 502, 605 P.2d 10, The doctrine of *res judicata* has long been recognized to have a dual aspect. [Citations.] 'In its primary aspect the doctrine of *res judicata* operates as a bar to the maintenance of a second suit between the same parties on the same cause of action.' (*Clark v. Lesher* (1956) 46 Cal.2d 874, 880, 299 P.2d 865....) Also, the doctrine comes into play in situations involving a second suit, not necessarily between the same parties, which is based upon a different cause of action. There '[t]he prior judgment is not a complete bar, but it operates [against the party against whom it was obtained] as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' (*Id.,* citations omitted.) The court's footnote [4] provides: This second aspect is referred to as judgment by estoppel or, more commonly, collateral estoppel. (See *Clark v. Lesher, supra,* 46 Cal.2d at 880, 299 P.2d 865.) (*Henn v. Henn, supra,* 26 Cal.3d at pp. 329–330, 161 Cal.Rptr. 502, 605 P.2d 10, emphasis added; see also 4 Witkin, *Cal.Procedure* (2d ed. 1971) Judgment, § 148, p. 3293.) The basic principles of *res judicata,* as set forth in *Summerford v. Board of Retirement* (1977) 72 Cal.App.3d 128, 130, 139 Cal.Rptr. 814, are: A judgment in one tribunal is *res judicata* as to subsequent proceedings where: (1) the identical issue is under consideration; (2) a final judgment was reached on the merits in the earlier adjudication; (3) the party against whom that judgment is now asserted was a party or in privity with a party in the prior action. [Citations.] (See also *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 813, 122 P.2d 892; *Saunders v. New Capital for Small Businesses, Inc.* (1964) 231 Cal. App.2d 324, 331, 41 Cal.Rptr. 703; *Jackson v. City of Sacramento* (1981) 117 Cal. App.3d 596, 172 Cal.Rptr. 826.)

*Garcia v. Borelli,* 129 Cal.App.3d 24, 32, 180 Cal.Rptr. 768, 772 (Cal.Ct.App.1986); *see People v. Sims,* 32 Cal.3d 468, 476, 651 P.2d 321, 326, 186 Cal.Rptr. 77, 82 (Cal.1982); *Clark v. Lesher,* 46 Cal.2d 874, 879, 299 P.2d 865, 868 (Cal.1956).

Furthermore, on the proper application of issue preclusion, the Ninth Circuit Court of Appeals has taught:

The general rule of collateral estoppel, or issue preclusion, is stated in § 27 of the RESTATEMENT (SECOND) OF JUDGMENTS (1982) ("RESTATEMENT") as follows: When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

\* \* \* \* \* \*

The elements necessary to invoke collateral estoppel are: the issue is actually litigated in the previous proceeding, there is a full and fair opportunity to litigate the issue, resolution of such issue is essential to the decision, there is a valid and final decision on the merits, and there is a common identity of the parties.... As the parties have noted, the "final judgment" requirement is somewhat more relaxed for purposes of "issue preclusion" than it is for purposes of "claim preclusion": [F]or purposes of issue preclusion (as distinguished from merger and bar), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect. RESTATEMENT at § 13.... Whether a judgment is "sufficiently firm" as to be "final" within the meaning of § 13 of the RESTATEMENT depends upon consider-

ation of several factors. Preclusion should be refused, for example, where the decision to be carried over is "avowedly tentative." RESTATEMENT at § 13 cmt. g. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, and that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision should be given preclusive effect. *Id.* The basic test, according to the RESTATEMENT, is whether the earlier decision was "procedurally definite," and not whether the court might have had doubts in reaching the decision. *Id.*

*O'Malley Lumber Company v. Lockard (Matter of Lockard),* 884 F.2d 1171, 1174–1175 (9th Cir.1989); *see Borg–Warner Corp. v. Avco Corp.,* 850 P.2d 628, 634–635 (Alaska 1993).

 In the present case, although over two months passed between the date the Municipal Court ordered Brown to prepare a judgment against Simonis, and the filing of Simonis' bankruptcy petition, no judgment appears in the record. Moreover, the Municipal Court's Decision on Submitted Matter contains no written findings of fact and conclusions of law or other rationale to support the order, including no statement of jurisdiction. In addition, since the Municipal Court is not a court of record, no transcript appears in the record by which to evaluate the proceedings, or whether and to what extent the matter of Simonis' alleged slander of title was fully heard and actually litigated.

Given the foregoing litany of weaknesses in the record at hand, the Court finds the Municipal Court record insufficiently clear to determine whether its decision in Brown's favor on his slander of title complaint is "procedurally definite.[1]" *Id.;* RESTATEMENT (SECOND) OF JUDGMENTS (1982) § 13, Cmt. *g.* Therefore, the Court holds the doctrine of collateral estoppel does not apply to the facts at bar. Further, given the absence of a "final judgment on the merits" not subject to amendment, California's doctrine of *res judi-*

*cata* likewise cannot apply. See *Mueller v. J.C. Penney, Co.,* 173 Cal.App.3d 713, 719, 219 Cal.Rptr. 272, 277 (Cal.Ct.App.1985) (final judgment is one "immune, as a practical matter, to reversal or amendment.") (citing *Miller Brewing v. Jos. Schlitz Brewing,* 605 F.2d 990, 996 (7th Cir.1978)).

This Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Simonis is directed to file with this Court a judgment against Brown in conformance with this Order within ten days from entry hereof.

---

1. Indeed, the Municipal Court amended its Decision on Submitted Matter on March 1, 1996. (Plt.'s Mem. of Points and Authorities in Supp. of

Mot. for Summ J., Exhibit B). Until entry of judgment in the matter, it continues free to do so.